# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAQUA LAMEEK RITTER

*Appellant,*

v.

UNITED STATES

*Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

_____

## OPENING BRIEF OF APPELLANT
## DAQUA LAMEEK RITTER

_____

Lindsey S. Vann
JUSTICE 360
900 Elmwood Avenue, Suite 200
Columbia, SC 29201
(803) 765-1044
lindsey@justice360sc.org

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE ............................................................. 2

    I.    Pre-Trial Investigation .......................................................... 2

    II.   Trial Proceedings and Testimony .......................................... 6

    III.  Post-Trial Proceedings ...................................................... 11

SUMMARY OF ARGUMENT ............................................................ 13

ARGUMENT ................................................................................... 14

    I.    The District Court Erred in Finding a Curative Instruction was
        Sufficient to Mitigate the Prejudice of The Jury Hearing Inadmissible
        Hearsay that Ritter Admitted Committing the Killing to His Uncle Who
        Did Not Testify ................................................................... 14

               a.  Factual Background ....................................................... 14

               b.  Legal Standard and Argument ........................................ 16

    II.   The District Court Erred in Denying a New Trial Despite Ritter's Right
        to an Impartial Jury Being Violated Because A Juror Had an Actual
        Bias .................................................................................. 21

               a.  Factual Background ....................................................... 21

               b.  Legal Standard and Argument ........................................ 23

    III.  The District Court Erred in Finding Sufficient Evidence to Prove (1)
        the killing of Doe was "Because of Doe's Actual and Perceived Gender
        Identity," and (2) it was "Reasonably Likely" that Ritter's Statements

to State Law Enforcement Agents would be Transmitted to Federal Law Enforcement Agents ............................................................................26

    a.  Standard of Review ........................................................26

    b.  The District Court Erred in Finding Sufficient Evidence to Prove the killing of Doe was "Because of Doe's Actual and Perceived Gender Identity .......................................26

    c.  The District Court Erred in Finding Sufficient Evidence to Prove it was "Reasonably Likely" that Ritter's Statements to State Law Enforcement Agents would be Transmitted to Federal Law Enforcement Agents ..............................29

CONCLUSION .......................................................................................33

REQUEST FOR ORAL ARGUMENT .................................................33

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Federal Cases

*Bruton v. United States*, 391 U.S. 123 (1968) ...................................................17, 20

*Burrage v. United States*, 571 U.S. 204 (2014) ........................................................27

*Fitzgerald v. Greene*, 150 F.3d 357 (4th Cir. 1998) ...............................................23

*Fowler v. United States*, 563 U.S. 668 (2011) ....................................................30, 31

*Johnson v. United States*, 576 U.S. 591 (2015) .......................................................33

*Krulewich v. United States*, 336 U.S. 440 (1949) ....................................................19

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) ....................25

*United States v. Alerre*, 730 F.3d 681 (4th Cir. 2005) ............................................26

*Smith v. Phillips*, 455 U.S. 209 (1982) .............................................................23, 24

*Throckmorton v. Holt*, 180 U.S. 552 (1901) ............................................................17

*United States v. Alerre*, 730 F.3d 681 (4th Cir. 2005) ............................................26

*United States v. Allsup*, 566 F.2d 68 (10th Cir. 1977) ............................................25

*United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013) ...........................................21

*United States v. Brevard*, 739 F.2d 180 (4th Cir. 1984) ....................................17, 20

*United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018) ..........................................14

*United States v. Chong Lam*, 677 F.3d 190 (4th Cir. 2012) ....................................16

*United States v. Ince*, 21 F.3d 576 (4th Cir. 1994) ......................................17, 19, 20

*United States v. Lawhorne*, 29 F. Supp. 2d 292 (E.D. Va. 1998)...........................25

*United States v. Malloy*, 758 F.2d 979 (4th Cir. 1985)............................................24

*United States v. Miller*, 767 F.3d 585 (6th Cir. 2014) ............................................27

*United States v. Nicholson*, 676 F.3d 376 (4th Cir. 2012)..................................19, 27

*United States v. Wallace*, 515 F.3d 327 (4th Cir. 2008) .........................................14

*United States v. Wood*, 299 U.S. 123 (1963) ..........................................................23

**Statutes and Rules**

S.C. Code § 16-3-20 ...................................................................................................32

18 U.S.C. § 249 ...............................................................................................1, 26, 27

18 U.S.C. § 924 ...........................................................................................................1

18 U.S.C. § 1512 ....................................................................................................1, 30

28 U.S.C. § 1291 ...........................................................................................................1

Federal Rule of Evidence 404 ..............................................................................11, 20

## JURISDICTIONAL STATEMENT

Appellant Daqua Ritter was charged in three counts of a four-count indictment filed in the District of South Carolina on January 17, 2023. JA22–25. Count 1 alleged a hate crime resulting in death because of the victim's actual and perceived gender identity in violation of 18 U.S.C. § 249(a)(2). Count 2 alleged use of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(j)(1). Count 3 alleged misleading conduct to hinder, delay, and prevent communication to a law enforcement officer of the United States of information relating to the commission of a possible federal offense in violation of 18 U.S.C. § 1512(b)(3). Pursuant to these statutes, jurisdiction was proper in the federal district court.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which authorizes this Court to review final decisions of the district courts. The final judgment in the court below was filed on October 21, 2024. JA1478. The notice of appeal was timely filed the same day, JA1484, granting this Court jurisdiction over the appeal.

## STATEMENT OF ISSUES

(1) Whether the district court erred in denying a new trial following the inadmissible hearsay testimony of Kerria Mallory that amounted to a confession from Ritter—i.e. that Ritter's uncle told her he heard Ritter killed the victim immediately after speaking with Ritter soon after the crime occurred.

(2) Whether the district court erred in denying a new trial where the jury foreperson was biased against Ritter as demonstrated by her call to the press

1

following the verdict and exaggeration of her experiences of violence against transgender women to "call[] attention" to the issue.

(3) Whether the district court erred in finding the Government presented sufficient evidence to prove the killing of Dime Doe was "because of Doe's actual and perceived gender identity."

(4) Whether the district court erred in finding the Government presented sufficient evidence to prove it was reasonably likely that Ritter's statements to state law enforcement officers would eventually be transmitted to a federal officer.

## STATEMENT OF THE CASE

At 5:51 p.m. on August 4, 2019, the Allendale County Sheriff's Office responded to a call on a rural road and found "[a] white car backed up into the driveway and what appeared to [the officer] was a female slumped over the steering wheel." JA199, JA206, JA210. The victim died of three gunshot wounds to the head, and three .25 caliber bullet casings were found inside the car. JA234–235, JA985. The responding officers identified the victim as Ernest Doe, a transgender woman who was known to friends and acquaintances as "Ernie Bernie" or "Dime Doe." JA263.

I. **Pre-trial Investigation.**

Because Allendale is a small Sheriff's Office, the responding officer contacted the South Carolina State Law Enforcement Division ("SLED"), which responded and took over the investigation, including documenting the crime scene and interviewing witnesses. JA218–219, JA253–254, JA255, JA259–260.

At the crime scene, SLED Agent Lawrence Wiggins learned from an Allendale Sheriff's deputy that the deputy had pulled Doe over earlier that afternoon in a traffic stop that lasted from 3:01–3:10 p.m. JA243, JA456. The deputy reported that Doe had an unidentified passenger in the car during the stop. JA240, JA242–243. The deputy "knew there was a passenger there," but "got no indication anything was wrong" during the stop. JA242–243.

Because the rural crime scene provided no clues as to who killed Doe—no security footage existed, nor did any eyewitness observe the killing—Wiggins began questioning the community members who had arrived at the crime scene about the victim's relationships. JA261–262. Wiggins testified he learned from someone in the group, which included members of the victim's family, that Doe was in a relationship with Daqua Ritter.[1] JA262, JA347.

After the scene was processed, Wiggins went with other SLED agents to Ritter's grandmother's house to speak with Ritter. JA267–268. They began speaking with Ritter on the front porch but later moved inside for Ritter to give a written statement about his activities that day. JA270–271. Ritter denied being in the car with Doe during the day. JA279. Wiggins, however, believed Ritter was in the car with Doe during the traffic stop because Ritter's tattoos appeared consistent with

---

[1] Wiggins did not create a written report of the interview with the individuals at the crime scene (nor did anyone else at SLED) or recall who provided Ritter's name to law enforcement. JA347–348.

those Wiggins noted on the passenger's arm on the traffic stop body cam video. JA142–143; *see also* JA1104 (testimony that, following his arrest, Ritter admitted to being in the car with Doe during the traffic stop).

Ritter told the agents that he spent time with individuals in "The Lane" area of Allendale and saw Parris Lee during the day. JA281–283, JA298. Ritter also indicated that he was from New York City and had plans to return there.[2] JA283, JA371; *see also* JA590 (Facebook messages indicated Ritter was scheduled to go to court in New York and was there on August 9th). After speaking with the agents at his grandmother's, Ritter voluntarily went to the Sheriff's Office and submitted to a gunshot residue ("GSR") test and provided a DNA sample. JA313, JA307–309, JA349–350.

Wiggins did not arrest Ritter following the August 4th interview and forensic testing nor did he tell Ritter he could not return to New York as planned. JA377. After the interview with Ritter, Wiggins continued his investigation, speaking with many witnesses around Allendale and reviewing information from Doe's phone. *See* JA378, JA380–381. Wiggins determined that Xavier Pinckney, an Allendale resident who smoked marijuana with Ritter the morning of Doe's death, called Doe's phone around 4:41 p.m. on August 4th. JA329–330, JA381–382, JA582, JA757, JA763.

---

[2] Witnesses who knew Ritter confirmed that Ritter was from New York City but spent time in Allendale where his grandmother was from and still owned a house. *See, e.g.*, JA524–525, JA550, JA1037.

When Wiggins first interviewed Pinckney, Pinckney said he did not know anything about the crime and refused to give Wiggins his phone number. JA356. Over the next eleven months, SLED continued investigating the murder but made no arrest. *See* JA361.

In July 2020, a man named Marcus Witherspoon was in federal custody in Richland County, South Carolina. JA361. Witherspoon contacted federal prosecutors and indicated his relatives had information about a homicide in Allendale that involved a transgender victim. JA361–362. The federal prosecutors reached out to Wiggins about the Doe homicide and took over the investigation. *See* JA362.

The FBI subsequently conducted over 50 witness interviews, which initially revealed little more than rumors that Ritter was involved in the Doe case. JA588, JA590. Before Doe's death, there had been rumors that Ritter and Doe were in a sexual relationship. JA607, JA661–662. When Doe died, this rumor laid the foundation for a new one: Ritter was involved in Doe's death. JA588, JA590. In a town where "everybody knows everybody," the "rumor[] spread like wildfire." JA351–352. The investigation continued over the course of two more years, and eventually, through the Government's use of proffer and cooperation agreements,

multiple witness statements converged to implicate Ritter in the killing of Doe.[3] *See generally* JA 645, JA700–701, JA898–899. On January 30, 2023, federal agents in Jamaica, Queens arrested Ritter for the murder of Doe. JA1093–1094.

## II. TRIAL PROCEEDINGS AND TESTIMONY.

The case proceeded to trial on February 20–24, 2024. No forensic evidence connected Ritter to the crime scene. DNA testing merely indicated Ritter's DNA was found on the outside and inside passenger door handles of Doe's car, which Ritter admitted to being in earlier that day. JA1076. Ritter was excluded as a DNA contributor to DNA on the cartridge casings found in the car, DNA found on the driver's seat, and DNA found under the victim's fingernails. JA1076–77.

Without physical evidence implicating Ritter, the Government's case depended on (1) the testimonies of witnesses claiming Ritter and Doe's relationship was sexual and that Ritter did not want people to know about it;[4] and (2) the testimonies of a handful of people who asserted Ritter was involved in the murder,

[3] As discussed below, though the witnesses' statements converged to implicate Ritter, their statements were inconsistent on other points and often contradicted each other.

[4] For example, Jaida Harvey testified that Ritter spent the night with Doe at her house one night during the summer of 2019. JA540–541. Kateris (Yanna) Albany also testified that, some months before the murder, she broke off a relationship with Ritter because she found out he was sleeping with Doe, and Ritter said, "Dime better have [sic.] stop lying on him or he was going to beat Dime's ass." JA614–618, JA623. However, Albany observed that Ritter and Doe actually got closer after she confronted Ritter about the relationship. JA619.

all of whom changed their stories over the course of the investigation and/or who testified to obtain leniency from the Government. *See generally* JA645, JA700–701, JA898–899, JA918; *see also* JA356 (Wiggins testifying that Pinckney lied repeatedly during the investigation).

Xavier Pinckney and Cordell Jenkins testified that they were with another friend, Artaveis Youmans, and saw Ritter the morning of Doe's murder when they all smoked a blunt together.[5] JA666–667, JA763–764. Pinckney—who was charged with lying to federal agents in this case and testified pursuant to a plea agreement, JA25–26, JA786–787—testified that on the morning she died, Doe drove up with another friend and Ritter got into Doe's car to talk to them. JA764–765. When the conversation was over and Doe was leaving, Ritter said he would hit her up later. JA764–765. Later that day, Ritter asked Jenkins and Pickney if he could borrow one of their phones. JA664. Jenkins told Ritter no because he did not know Ritter very well. JA664, JA684. Pinckney lent Ritter his phone, which Ritter used to send text messages to Doe. JA765–766. Later, Ritter parted ways with the others. JA766.

From 3:01-3:10 p.m., Ritter and Doe were together in Doe's car during the traffic stop, when the officer "got no indication that anything was wrong." JA240,

---

[5] Pinckney, Jenkins, and Youmans were best friends who knew each other since grade school and hung out every day. JA1003–1004. They did not know Ritter until the weeks before the crime. JA1003; *see also* JA757 (Pinckney testifying he met Ritter at a party and they "would smoke, smoke weed. That's it.").

242–43. Between that time and when Doe's body was found about two hours and forty minutes later, at 5:51 p.m., no one saw Ritter and Doe together.[6] JA456–457, JA468. To try to place Ritter and Doe together, the Government relied on Pinckney, who testified that he had received a text from an unknown number, and when he called that number at 4:41 p.m., Ritter answered the phone and said he would be returning to Allendale soon.[7] JA770–771, JA833. The unknown number was later identified as belonging to Doe. JA841.

Kerria Mallory, the former girlfriend of Ritter's uncle Kalvin Peeples who lived just down the road from where Doe's body was found, testified that on August 4th, Ritter arrived at Peeples's house in the evening. JA906–907. She admitted on cross-examination that her testimony conflicted with what she had previously told police—that Ritter arrived at the house around 2 or 3 p.m. JA919. Shortly after arriving, Ritter's uncle gave him a ride back to the town of Allendale. JA909.

---

[6] Task force officer Jerome DeSheers testified about the location of Doe's phone during the day, but he did not analyze any other phones or where they were relative to the location of Doe's phone. JA862. He further testified that he could not tell if Doe's phone was at the crime scene during the final call that connected to Doe's phone at 4:41p.m. JA866.

[7] Pinckney only asserted Ritter answered the phone during this call after two meetings with law enforcement and two meetings with federal investigators and prosecutors, and after failing to disclose this information during an initial proffer session with the Government. JA783, JA785–786.

The testimony regarding what time Ritter arrived back in Allendale and what happened when he got there varied greatly. Carrie Mae Frazier testified that Ritter arrived around 4:15 p.m., before the 4:41 phone call. JA961–962. Pinckney, Jenkins, and Youmans testified that Ritter returned at an unknown time and burned clothing in a fire behind Youmans's grandmother's home. JA684, JA794, JA1019. They all gave inconsistent accounts of the details surrounding this supposed burning of the clothes. First, Jenkins testified Ritter shook something out of a bag into a burn barrel, which was set on fire with kerosene. JA673, JA691. Then, Pinckney testified Ritter had clothes balled up in his hand, asked Youmans for gas and a lighter, JA772, and then used the gas to set the clothes on fire, only to stomp out the flames when a woman named Jamie Priester arrived in the yard. JA827. Finally, Youmans testified that Ritter arrived with a grocery bag containing what looked like gray shorts. JA1011. He was adamant that the fire happened the day after Doe's death, not on the same day, JA1020; that the others were lighting the burn barrel when he came out of the house and the bag was gone, JA1012; and that he was not involved in starting the fire, JA1020.[8]

---

[8] In addition to the disagreements about what was burnt and how, Pinckney testified that many ("too many to count") police officers arrived after the fire and spoke to the owner of the house. JA799–801. Wiggins testified he was unaware of any Allendale officers or SLED agents responding to that location on the day of the murder. JA213–214, JA462–463.

Pinckney also testified that he later saw Ritter again in a car with Devontre Priester ("Man Man"), and Man Man asked Pinckney to hide a gun. JA775. When Pinckney refused, he said Ritter asked him "so you ain't going to do it?" JA775. Jamie Priester, Marcus Witherspoon's sister, testified that she saw Ritter in the car with her son Man Man on August 5th, though she previously told agents it was August 4th, and got in the car with them. JA872, JA878–879, JA890. She testified that, even though Ritter knew she got into the car, she overheard Ritter say he killed Doe because Doe had a picture of them together on her phone that they were looking at when Ritter shot her.[9] JA879–882. Finally, Jenkins testified that though he would not lend his phone to Ritter on August 4th because he "didn't know him," the next day he ran into Ritter who asked him to "get this gone from me." JA679–680, JA684–685. He believed "this" to be a gun because he saw "a piece of it" and it was silver, and it was in Ritter's waistband. JA681.

In addition to this testimony, two Government witnesses provided inadmissible, prejudicial testimony to the jury. First, Kerria Mallory testified over defense counsel's objection that, on his way back from dropping Ritter off in

_____

[9] The details of this alleged "confession" are contradicted by other evidence presented at trial. For example, no picture of Ritter and Doe was found on Doe's phone despite the recovery of deleted images from Doe's phone. *See* JA495. Priester also testified that Ritter fired the first shot from outside the car and then ran up and fired a second shot, contrary to undisputed evidence that all three cartridge casings were found inside the car. JA234–235, JA881, JA748.

Allendale, Ritter's uncle said "he heard that Daqua killed Dime Doe." JA912. Ritter moved for a mistrial, which was denied. JA922. The trial judge instead gave a curative instruction, telling the jury to disregard the inadmissible hearsay testimony. JA932. Second, Agent Delise Jeffrey, who was involved in Ritter's arrest in New York, testified that she learned about Ritter's location "[w]hen he was being arrested a couple times . . . " JA1091. Defense counsel immediately objected that this testimony was contrary to the Government's pretrial agreement that they were not admitting other bad acts evidence under Federal Rule of Evidence Rule 404(b). JA1091. The Government moved to strike the question and answer, and the trial court issued a curative instruction, instructing the jury to disregard the testimony. JA1092–1093.

Following about four hours of deliberation, the jury convicted Ritter on all counts. JA1261, JA1266–1269.

III.    **POST-TRIAL PROCEEDINGS.**

On the Monday following the Friday evening verdict, the Associated Press published an article indicating that Juror 71, who was also the jury foreperson and a transgender woman, had reached out to the AP after the verdict. JA1304. The article stated Juror 71 felt "compelled to discuss the case given its historic nature" and told the reporter that she had shared experiences with the victim: "In my personal experience, it can be dangerous for transgender women to date." JA1306, JA1307.

The same day the article was published, Juror 71 also emailed the trial court indicating she learned she may have "a possible connection to Dime Doe through someone that [she] work[s] with." JA1271. At a status conference the following day, the trial court ordered an evidentiary hearing. JA1271–1272.

At the evidentiary hearing, Juror 71 testified about the article's description of her shared experience with the victim. She testified: "I was quoted correctly in that article; however, my quote was perhaps not entirely correct. These were not personal experiences. These were experiences -- general transgender experiences. I was calling attention to violence against trans women in general." JA1294–1295. She also testified that the possible work connection to the victim was that she learned after the trial that someone in her department was related to the victim. JA1286–1287.

Ritter filed a Motion for A New Trial Based on Juror Bias, JA1298–1302, and a Motion for Judgment of Acquittal or in the Alternative for New Trial based on insufficiency of the evidence and because the trial was infected by prejudicial, inadmissible evidence that could not have been disregarded by the jury, JA1330–1346. The trial court denied both motions, JA1449–1477, and sentenced Ritter to life on counts one and two and 240 months as to count three, concurrently. JA1479. This appeal follows.

## SUMMARY OF ARGUMENT

The Government's case against Ritter was based on testimony from many witnesses who changed their stories over the course of the investigation—often to avoid their own prosecution or obtain leniency—and whose testimony contradicted each other on various key points. During the testimony of Kerria Malloy, who the Government presented to place Ritter near the crime scene after the murder, Mallory provided inadmissible hearsay testimony that indicated Ritter confessed to the killing to his uncle. The district judge denied a mistrial and instructed the jury to disregard the improper testimony. Because the jury would have understood Mallory's testimony to be a confession by Ritter, which he had no opportunity to cross-examine because it was hearsay, the curative instruction was not likely to remove the strong prejudicial effect of the testimony. The district court abused its discretion in denying Ritter's requests for a new trial on this basis.

After trial, the jury foreperson contacted the media and conducted an interview revealing her previously undisclosed bias. She exaggerated her own experience to draw attention to the dangers of dating as a transgender woman, revealing she was biased in favor of people like the victim and against people in the position of Ritter who stood accused of committing violence against a transgender woman. The district court abused its discretion in denying Ritter's motion for a new trial on the basis of juror bias.

Finally, the Government failed to present sufficient evidence to prove the murder was "because of" the victim's actual or perceived gender identity and that statements Ritter made to state law enforcement were reasonably likely to be transmitted to federal law enforcement. The district court erred in denying Ritter's motion for judgment of acquittal on this basis.

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN FINDING A CURATIVE INSTRUCTION WAS SUFFICIENT TO MITIGATE THE PREJUDICE OF THE JURY HEARING INADMISSIBLE HEARSAY THAT RITTER ADMITTED COMMITTING THE KILLING TO HIS UNCLE WHO DID NOT TESTIFY.**

"[A] district court's denial of a motion for a mistrial and its decision regarding a curative instruction" are reviewed "for an abuse of discretion." *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008). This Court "review[s] a district court's evidentiary rulings for abuse of discretion, and such rulings are subject to harmless error review." *United States v. Burfoot*, 899 F.3d 326, 341 (4th Cir. 2018).

### a. *Factual Background.*

Kerria Mallory used to date Ritter's uncle, Kalvin Peeples, who lived on Concord Church Road near where Doe's body was found on August 4th. JA903. Mallory testified that she was at Peeples's house on August 4th, sleeping on the couch, when Ritter arrived. JA907. Peeples and Ritter spoke, and then Peeples indicated he was going to give Ritter a ride uptown to the store, about twenty minutes away. JA908, JA910. While Peeples was gone, Mallory left to go to her mother's

house. JA910. While driving down Concord Church Road, she said she saw a car backed up to the side of the road and police vehicles already there. JA910–911. She testified that she called Peeples after she saw "all of that on his road." JA911.

The Government then asked, "what was his [Peeples's] reaction when you told him that information?" JA911. Defense counsel objected that the answer would be hearsay, but the Government asserted it was eliciting Peeples's demeanor, and the Court overruled the objection. JA911. Mallory then testified to the jury: "He said he heard that Daqua killed Dime Doe." JA912. Defense counsel immediately objected that the answer was hearsay. JA912. At a bench conference outside the hearing of the jury, the Government explained her answer was not expected based on her grand jury testimony when Mallory had testified that Peeples sounded nervous during that phone call. JA912. In front of the jury, the Government attempted to "clear it up," showing Mallory her grand jury testimony, and clarifying that she previously testified Peeples "sounded nervous." JA912, JA914–915. On cross examination, defense counsel attempted to clarify that Mallory had never before said Peeples told her Ritter had anything to do with the crime, but Mallory responded: "He did. He just said he heard that's what happened." JA918.

After Mallory's testimony was completed, defense counsel moved for a mistrial, arguing the testimony was that "Peeples relayed an admission from our client basically that he had committed the murder." JA922. Counsel argued the

15

statement was "extremely prejudicial" and could not be cross examined because Peeples was not the witness who testified regarding the statement." JA924. The district court denied the motion. JA924, 925–927. After the lunch break, the jury returned, and the district court gave the following curative instruction:

> Prior to lunch, the last witness on the stand was Ms. Mallory, and you heard her make a statement that was hearsay. Hearsay is an out-of-court statement, and our rules don't allow hearsay evidence; our very important Rules of Evidence.

> She provided an out-of-court statement made by Kalvin Peeples. I am advising you to disregard this statement. She was asked, what reaction did Mr. Peeples have when you told him you saw a crime scene near his house? And she gave an out-of-court statement, a hearsay statement that he said he heard that Daqua killed Dime Doe.

> I am instructing you to disregard that statement as evidence. You are to wipe it from your minds as if it was never said. It is not evidence. You cannot treat it as evidence. And you have taken an oath to follow my instructions, so I expect you not to treat it as evidence in any way.

JA932.

Following the verdict, Ritter renewed his motions regarding these inadmissible statements and moved for a new trial. JA1340–1343. The district court erred in denying a new trial.

### b. *Legal Standard and Argument.*

Though the district court correctly found Mallory's hearsay testimony was inadmissible, it abused its discretion in finding the curative instructions were sufficient and denying a mistrial. While "juries are presumed to follow their instructions," *United States v. Chong Lam*, 677 F.3d 190, 204 (4th Cir. 2012), this

Court has recognized that "[c]urative instructions . . . are not always adequate." *United States v. Brevard*, 739 F.2d 180, 182 (4th Cir. 1984). "There are instances where the jury is exposed to inadmissible evidence which could make a strong impression that instructions to disregard it may not remove its prejudicial effect." *Id.* (citing *Bruton v. United States*, 391 U.S. 123, 129–35 (1968); *Throckmorton v. Holt*, 180 U.S. 552, 567 (1901)). This Court has found curative instructions insufficient to remove the prejudicial effect of inadmissible testimony, specifically where the testimony involved a hearsay confession by the defendant, *United States v. Ince*, 21 F.3d 576, 584–85 (4th Cir. 1994), and where the inadmissible polygraph testimony directly "prejudiced a defendant whose credibility was vital to the case's outcome." *Brevard*, 739 F.2d at 183.

In this case, the prejudice of Mallory's hearsay confession testimony could not be cured by a curative instruction. The district court erred in finding "Mallory's testimony did not receive undue weight at trial" because the jury learned on cross-examination that her statement was not consistent with her grand jury testimony and because the jury heard about the "rumor mill" in Allendale that quickly spread that Ritter was implicated in the crime. JA1467.

First, the district court overstated the value of the cross-examination conducted with Mallory's grand jury testimony. Mallory did not retract her statement; at most, the questioning demonstrated that she had not provided this testimony before.

JA914–15. More detrimentally, the cross-examination did not indicate the information Peeples received came from anyone but Ritter. All she said was that she had "no idea how he learned that information." JA918–19.

Second, the district court incorrectly attributed Mallory's statement to the "rumor mill," contrary to Mallory's testimony that placed the statement close in time to the crime, before the rumor mill implicated Ritter, and connected the statement directly to Ritter. Mallory testified that Peeples gave Ritter a ride, and before Peeples returned from dropping him off, Mallory left the house and saw the crime scene and emergency vehicles. JA910–911. "After seeing the police lights," Mallory called Peeples. JA911. So, while Peeples was still in transit from giving Ritter a ride, Mallory said Peeples told her: "He said he heard that Daqua killed Dime Doe." JA912. Mallory gave no indication that Peeples went anywhere or spoke with anyone else during this trip. The jury hearing this would have understood Mallory to say that Ritter told Peeples during the ride that he killed Doe. This is especially so given the Government's emphasis that Mallory saw Ritter at Peeples's house right after the crime, making Peeples's statement too soon for rumors to have spread of Ritter's involvement. JA287 (Peeples lives about a half mile from the crime scene); JA454 (Agent Wiggins's testimony disagreeing that "Ritter's name got around that fast"); JA1190 (Government closing emphasizing: "Right after the murder, the defendant did show up at his uncle's house unexpected."). By relying on these erroneous factual

premises, the district court abused its discretion. *United States v. Nicholson*, 676 F.3d 376, 383 (4th Cir. 2012) ("A district court abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises.")

This case is like *United States v. Ince*, in which this Court reversed a defendant's conviction following the improper hearsay testimony that the defendant confessed to shooting a gun (the main issue for a determination of guilt).[10] 21 F.3d 576. In that case, the Court recognized that "[e]vidence of a confession can have such devastating and pervasive effect that mitigating steps, no matter how quickly and ably taken, cannot salvage a fair trial for the defendant." *Id.* at 583. Due to the prejudice of an improperly admitted confession, the Court found that "although we recognize the presumption of cure by a court's instruction, it seems probable here that the jury was unable to follow the instruction on impeachment by prior inconsistent statement." *Id.* at 584 (citing *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J. concurring) ("The naïve assumption that prejudicial effects can be overcome by instructions to the jury, . . . all practicing lawyers know to be unmitigated fiction.")).

---

[10] At trial, a military police ("MP") officer testified she did not remember the defendant confessing to her, and the Government improperly presented a second MP to testify the first MP told him the defendant confessed. *Ince*, 21 F.3d at 578–79.

Given the circumstances of Mallory's statement, the jury heard that Ritter confessed to committing the killing to his uncle almost immediately following the crime. This would have left them with "such a strong impression that the district court's instructions to disregard may not remove its prejudicial effect."[11] *Brevard*, 739 F.2d at 182. Ritter had no opportunity to cross-examine the alleged confession because it was presented through hearsay testimony rather than by the person who allegedly heard it. *See Bruton*, 391 U.S. at 137 ("[T]he introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore."). Since "[e]vidence of a confession can have such a devastating and pervasive effect that mitigating steps, no matter how quickly and ably taken, cannot salvage a fair trial," this Court should vacate Ritter's conviction based on this inadmissible evidence. *Ince*, 21 F.3d at 583.

---

[11] The prejudice was compounded by additional improper testimony regarding "a couple" other arrests that special agent Jeffrey told the jury about in violation of the Government's pretrial assurance that it would not introduce evidence of other crimes pursuant to Federal Rule of Evidence 404(b). JA1091, JA31. The Government asserted it did not anticipate Jeffrey's answer and moved to strike the testimony. JA1091–92. The district court agreed and instructed the jury "you are to disregard the last question asked by the government and the response." JA1093. Thus, in this case lacking in forensic evidence and based on unreliable witnesses, the jury was asked to disregard two prejudicial inadmissible statements, and the curative instructions could not salvage a fair trial for Ritter.

II. **THE DISTRICT COURT ERRED IN DENYING A NEW TRIAL DESPITE RITTER'S RIGHT TO AN IMPARTIAL JURY BEING VIOLATED BECAUSE A JUROR HAD AN ACTUAL BIAS.**

This Court reviews "the district court's denial of a motion for new trial under an abuse of discretion standard." *United States v. Bartko*, 728 F.3d 327, 334 (4th Cir. 2013).

    a. *Factual Background.*

During jury selection, Juror 71 disclosed that, like the victim in this case, she is a transgender female. JA131. During questioning of the full panel of potential jurors, the district court indicated "this case is going to deal with such issues as transgender and gender identity" and asked any jurors who may be "concerned that they may not be able to render a verdict solely based on the evidence" to approach. *See* JA130. Juror 71 responded and informed the district court and the parties "I am trans. And I just didn't want that to become an issue. I personally don't think it would affect my decision one way or the other, but I'll leave it up to you." JA131. Juror 71 assured the court that her "identity as transgender" would not "prevent [her] from rendering a verdict in this case based solely on the evidence" and law given by the court. JA131. Based on this information, Juror 71 was not struck by the defense or the Government and was seated as a juror and served as the foreperson. JA138, 1304.

After the verdict, however, Juror 71 contacted the district court about a possible connection to the victim through a work relationship, JA 1271, and the

Associated Press published an article containing quotes from an interview with her. JA1303–1307.[12] The article indicated Juror 71 reached out to the Associated Press after the verdict and discussed Juror 71's considerations in reaching a verdict and reviewing the evidence in the case. *See id.* It also reported that Juror 71 is "a transgender woman" who "said she was compelled to discuss the case given its historic nature." JA1304, JA1306. Juror 71 wanted people to know "[w]e [transgender people] are everywhere. If one of us goes down, there'll be another one of us on the jury." JA1306. The article closed with a quote from Juror 71: "In my personal experience, it can be dangerous for transgender women to date." JA1307.

The district court held an evidentiary hearing, calling the juror as a witness, to address the possible connection to the victim and the article. JA1277–96. During the hearing, Juror 71 affirmed that the Associated Press correctly quoted her regarding her personal experience and the dangers of dating for transgender women and saying "[w]e're everywhere." JA1287–1288. Juror 71, nevertheless, asserted her "status as a trans person" did not "affect [her] ability to be fair and impartial." JA1289. At the request of Ritter's counsel, the district judge asked whether the juror's answer to a question on the jury questionnaire, which asked about

---

[12] The article reproduced in the Joint Appendix is redacted to remove Juror 71's name in accordance with the district court's instructions to avoid using the juror's name. JA1281. During the evidentiary hearing, Juror 71 confirmed the article was based on her conversation with the Associated Press, which correctly quoted her. JA1287–1288.

experiences as a victim or with victims of crime, was truthful. Juror 71 assured the court she had been truthful and was not herself a victim of a crime. Juror 71 explained, "I was quoted correctly in the article; however, my quote was perhaps not entirely correct. These were not personal experiences. These were experiences -- general transgender experiences. I was calling attention to violence against trans women in general." JA1294–1295.

Ritter then moved for a new trial based on Juror 71's bias, violating his Sixth Amendment right to an impartial jury. The district court ruled Juror 71 was not biased as she repeatedly swore she could be impartial. JA1474. This was an abuse of discretion.

b. *Legal Standard and Argument.*

"The Sixth Amendment requires that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.'" *United States v. Wood*, 299 U.S. 123, 133 (1963). Though "due process does not require a new trial every time a juror has been placed in a potentially compromising situation," due process does require "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "Circumstances occurring outside the voir dire" may give rise to "a general Sixth Amendment claim challenging the partiality of a juror." *Fitzgerald v. Greene*, 150 F.3d 357, 362–63 (4th Cir. 1998).

"Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." *Smith*, 455 U.S. at 221–22 (O'Connor, J., concurring). A "verdict may be set aside if a post-trial hearing demonstrates the juror was actually biased." *United States v. Malloy*, 758 F.2d 979, 982 (4th Cir. 1985).

Juror 71's statements demonstrate her bias. Immediately following trial, she reached out to the Associated Press, after feeling "compelled to discuss the case." JA1306. She also admittedly exaggerated her personal experience with the dangers of dating as a transgender woman in her interview to "call[] attention to violence against trans women in general." JA1294–1295. These statements reveal that Juror 71 had an agenda regarding the very issue in this case: violence against a transgender woman. She was so committed to addressing this issue that she told the reporter she had personal experience with violence against her as a transgender woman even though she had not. This demonstrates that she was biased in favor of protecting people like the victim in this case, as she indicated when she said "We're everywhere. And if one of us goes down, there will be another one of us on the jury." JA1288.

Despite Juror 71's assurances that she could be impartial in this trial, that cannot end the inquiry given that "the juror may have an interest in concealing [her] own bias" or "may be unaware of it." *Smith*, 455 U.S. at 221–22 (O'Connor, J.,

concurring). As another district court in this Circuit recognized, in finding a juror biased, "even though the Juror's subjective perception of the absence of bias . . . was doubtlessly thought by the Juror to be true at the time of his statements, his professions of impartiality must be assessed objectively in light of the conduct in which he engaged." *United States v. Lawhorne*, 29 F. Supp. 2d 292, 312 (E.D. Va. 1998) (finding a juror biased despite assurances to the court that his prior connection to the prosecutor would not undermine his impartiality); *see also United States v. Allsup*, 566 F.2d 68, 71 (10th Cir. 1977) (recognizing "[b]ias can be revealed by a juror's express admission of that fact, but, more frequently, jurors are reluctant to admit actual bias, and the reality of their biased attitudes must be revealed by circumstantial evidence" and finding two jurors who worked at other branches of a bank that was robbed biased in a bank robbery case).

Juror 71's actions in advocating on the issue of violence against transgender women, objectively assessed, demonstrate that she was biased. Her advocacy for people like the victim means, in turn, she was advocating against people alleged to commit violence against transgender women—against people like Ritter.[13] Ritter

---

[13] Had Juror 71 revealed this during voir dire, Ritter would have moved to strike her for cause, and if the district court (erroneously) denied that motion, Ritter would have used a peremptory challenge to remove Juror 71 and avoid being tried by a biased juror. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984) ("*Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors. . . . The necessity

was guaranteed under the Sixth Amendment a fair and impartial jury free from this type of bias. Accordingly, this Court should vacate his conviction and remand for a trial by an impartial jury.

III. **THE DISTRICT COURT ERRED IN FINDING SUFFICIENT EVIDENCE TO PROVE (1) THE KILLING OF DOE WAS "BECAUSE OF DOE'S ACTUAL AND PERCEIVED GENDER IDENTITY," AND (2) IT WAS "REASONABLY LIKELY" THAT RITTER'S STATEMENTS TO STATE LAW ENFORCEMENT AGENTS WOULD BE TRANSMITTED TO FEDERAL LAW ENFORCEMENT AGENTS.**

   a. *Standard of Review*

The Court "review[s] de novo a district court's denial of a Rule 29 motion for judgment of acquittal." *United States v. Alerre*, 730 F.3d 681, 693 (4th Cir. 2005). The Court will "sustain a guilty verdict if, viewing the evidence in the light most favorable to the Government, it is supported by 'substantial evidence.'" *Id.* "Substantial evidence" is defined "as evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

   b. *The District Court Erred in Finding Sufficient Evidence to Prove the killing of Doe was "Because of Doe's Actual and Perceived Gender Identity.*

The Government charged Ritter with willfully causing bodily injury to Doe, resulting in death, "because of Doe's actual and perceived gender identity." JA22; 18 U.S.C. § 249(a)(2). This made the motive for the murder an element that must be

---

of truthful answers by prospective jurors if this process is to serve its purpose is obvious.").

proven beyond a reasonable doubt. *See* 18 U.S.C. § 249(a)(2). It is not enough that the victim was transgender. Nor is it sufficient to show that Ritter and Doe had disagreements over the course of their relationship. What is required is a demonstration of but for causation, *United States v. Miller*, 767 F.3d 585, 591–92 (6th Cir. 2014) (citing *Burrage v. United States*, 571 U.S. 204, 210 (2014)), that Ritter killed Doe because she was a transgender woman. The Government's evidence was insufficient to prove this but for causation.

The district court found sufficient evidence because: (1) Ritter identified as heterosexual, was in a relationship with a woman named Delasia Green, and attempted to keep his relationship with Doe secret; (2) Ritter was distressed by rumors about the relationship, telling his girlfriend not to question his sexuality, and telling another woman that "the faggot had better stop lying;" and (3) Ritter threatened to harm Doe—telling Albany he "was going to beat Dime" and Pinckney "he was going to smack [Doe] and beat [Doe] up if [Doe] tried to fight back," and (4) text messages revealed Doe was "'scared' of Ritter and thought he 'might try to do [something].'" JA 1457–1459.

The district court erred in finding this evidence sufficient in two ways. First, the district court made erroneous factual conclusions based on the evidence. *See Nicholson*, 676 F.3d at 383 ("A district court abuses its discretion when it . . . relies on erroneous factual or legal premises."). The messages from Doe stating she was

"scared" of coming to see Ritter were from July 3rd, over a month before the offense. JA1348. As the messages after that date show, Ritter and Doe saw each other and continued to talk regularly after this time. JA1347–1381.[14] These communications included Doe asking to meet up and offering to get a room so they could "chill" the next day on July 4th. JA1351. Overall, the text messages reveal ups and downs in Doe and Ritter's relationship, but do not include anything indicating Ritter had a problem with Doe being transgender or threatening her.[15] *See* JA1347–1381.

Similarly, the testimony from Albany that Ritter threatened to beat Doe up for lying was either 3–4 months or 1–2 months before Doe's death (Albany offered conflicting testimony on the timing). JA622–623. Further, Albany testified that even though she heard Ritter threaten to beat Doe, he did not do so and Ritter and Doe "actually grew closer after" Albany confronted Ritter about having a sexual relationship with Doe. JA624; *see also* JA619. Similarly, Jaida Harvey testified that

---

[14] The chart of text messages found on these pages was admitted as an exhibit by the Government at trial. It was redacted prior to its admission into evidence to only show Ritter and Doe's messages to each other. Messages marked as "sent" were written by Ritter and those marked as "received" were written by Doe. *See* JA712–714.

[15] These messages end on August 2nd, two days before Doe's death, after Ritter indicates he does not have a phone and do not include any threats from Ritter to Doe. JA1381. The most they show is Ritter's frustration with housing insecurity and his girlfriend's misunderstanding of the relationship between him and Doe. JA1347–1381.

Ritter and Doe spent the night together at her house later in the summer, and Harvey did not "notice any tension between" Ritter and Doe. JA545.

Second, the district court relied on evidence unconnected to the murder or its motive. Ritter wanting to keep another relationship secret from his girlfriend and showing frustration when she questioned him about getting a room with someone else does not mean the motive for murder was that Doe was transgender. Additionally, Ritter's use of a derogatory term after being questioned by his girlfriend was not in anger toward Doe. Rather, the text message reveals Ritter merely shared what his girlfriend said with Doe, indicating frustration with Green (not Doe). JA1378. Ritter did not threaten Doe or even blame Doe for the fact that Green made that statement. JA1378. Even taken all together, this does not support a finding that Ritter committed murder because Doe was transgender.

Overall, the Government's evidence proved that a transgender woman was killed, not that being transgender was the motivation for the killing. As an element of the offense, the lack of sufficient evidence on this point undermines Ritter's conviction and this Court should vacate it.

c. *The District Court Erred in Finding Sufficient Evidence to Prove it was "Reasonably Likely" that Ritter's Statements to State Law Enforcement Agents would be Transmitted to Federal Law Enforcement Agents.*

The district court similarly abused its discretion in finding there was sufficient evidence to prove the "reasonably likely" element of Count 3—witness tampering

in violation of 18 U.S.C. § 1512(b)(3). This count requires a finding that Ritter (1) knowingly engaged in misleading conduct toward another person; (2) acted with the intent to hinder, delay, or prevent communication of information to a law enforcement officer; (3) that it was reasonably likely the information would have been transferred to a federal law enforcement officer or judge; and (4) that the information related to the commission or possible commission of a federal offense. JA1172–1173. The evidence at trial was insufficient to prove the third element: that it was reasonably likely the information would have been transferred to a federal law enforcement officer or judge. *See Fowler v. United States*, 563 U.S. 668, 677–78 (2011) (requiring the Government to show there is a reasonable likelihood that a relevant communication would have been made to a federal officer). It is not enough that the communication is about an act that could violate both state and federal law. *See Fowler*, 563 U.S. at 676 ("Often, when a defendant acts in ways that violate state criminal law, some or all of those acts will violate federal criminal law as well. And where a federal crime is at issue, communication with federal law enforcement officers is almost always a *possibility.* Thus, to allow the Government to show only a mere possibility that a communication would have been with federal officials is to permit the Government to show little more than the possible commission of a federal offense.") (emphasis original).

The alleged misleading conduct occurred on the night of August 4th, when

SLED agents and state investigators met with Ritter at his grandmother's house. JA24. The agents were all state law enforcement and indicated they were there about the death of Doe. *See* JA24, JA122–123. At no point did they indicate they were investigating Doe's murder as a hate crime (or any federal crime) or that they believed the murder may have been motivated by the fact that Doe was a transgender woman. *See* JA278–305 (describing the interview with Ritter). Instead, agents were investigating this murder case like they would any other state murder case.

Agent Wiggins further testified that he did not communicate with federal agents about this case for more than eleven months and that he did not seek out federal assistance in this case (it was a US Attorney who contacted him in July of 2020). JA361. Wiggins also testified that in the over 20 murder investigations he had conducted as a SLED agent, this case is the only one that became a federal murder case. JA345. Accordingly, at the time of the interview, no one—not the SLED Agent, not the Allendale Sheriff's Officers, not Ritter—considered the possibility this would become a federal case or that the information Ritter provided would be transferred to a federal agent.

While the district court recognized "the facts of Ritter's case are not such that 'the [federal witness tampering] statute fits like a glove,'" JA1461 (citing *Fowler*, 563 U.S. at 672) (alterations original), the court abused its discretion in finding sufficient evidence to find it was reasonably likely the information from the

interview would be transmitted to federal agents. The district court relied on the fact that the interview concerned the murder of a transgender victim, JA1462, despite that fact never being mentioned during the interview, much less an indication the state agents thought that was the motive for the murder.

Further, the district court reasoned that it was reasonably likely the communication would have been transferred to federal law enforcement because South Carolina does not have a hate crime statute allowing for the state to prosecute this crime. That is incorrect. Doe's killing is clearly subject to prosecution as a murder under South Carolina Code section 16-3-20. The maximum penalties under state law are the same as the charges brought in federal court. The South Carolina murder statute carries a sentence of 30 to life if the prosecution does not seek the death penalty, and the state could have sought a death sentence with the kidnapping aggravating factor (based on the prosecution's theory that Ritter lured Doe to the remote area where she was killed). S.C. Code § 16-3-20(A), (C)(a)(1)(b). Thus, there is no reason this conduct could only have been charged federally.

The evidence was, therefore, insufficient to satisfy the third element of the charge and this Court should vacate the conviction. To hold otherwise would mean that a person could be charged with witness tampering regardless of the likelihood that their communication would be transferred to federal agents if the communication is actually transferred at some distant point in the future. Such an

interpretation renders the statute unconstitutionally void for vagueness. *See Johnson v. United States*, 576 U.S. 591 (2015) (holding an increased sentence under the Armed Career Criminal Act's residual clause violates due process because "the Government violates this [due process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement").

## CONCLUSION

For the reasons stated above, Ritter respectfully requests this Court vacate his conviction and remand this case for a new trial.

## REQUEST FOR ORAL ARGUMENT

Ritter requests this Court grant oral argument on the issues presented in this brief.

**LINDSEY S. VANN**
Justice 360
900 Elmwood Ave., Suite 200
Columbia, SC 29201
(803) 765-1044
lindsey@justice360sc.org

BY: s/ Lindsey S. Vann

April 25, 2025.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,404 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

s/ Lindsey S. Vann