No. 24-4576

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

DAQUA LAMEEK RITTER, a/k/a Quavo,

Defendant-Appellant

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

————————

BRIEF FOR THE UNITED STATES AS APPELLEE

————————

BRYAN P. STIRLING
  United States Attorney
  District of South Carolina

BENJAMIN N. GARNER
  Assistant U.S. Attorney
  District of South Carolina

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General

ANDREW G. BRANIFF
BRANT S. LEVINE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-4373
  Brant.Levine@usdoj.gov

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION......................................................................1

STATEMENT OF JURISDICTION.........................................2

STATEMENT OF THE ISSUES............................................2

STATEMENT OF THE CASE ...............................................3

    A.   Ritter becomes increasingly irate as his relationship with Doe becomes public.........................................3

    B.   Ritter murders Doe, destroys evidence, and confesses to family and friends. ...............................4

    C.   Ritter repeatedly lies to the police..........................7

    D.   Ritter is indicted, tried, and convicted. ..................8

SUMMARY OF THE ARGUMENT .......................................10

ARGUMENT

    I.   The district court did not abuse its discretion by denying a motion for a new trial based on an isolated and unexpected instance of hearsay.....................13

        A.   The curative instruction mitigated any prejudice from the hearsay. ........................................14

        B.   The hearsay did not influence Ritter's conviction.......19

    II.   The district court did not abuse its discretion when it rejected claims of juror bias. .................................21

A.    The district court thoroughly examined allegations of juror bias.................................................23

B.    The district court committed no manifest error by ruling that Ritter failed to show that the juror was biased. .................................................................26

C.    Ritter's speculation about the juror's personal experiences do not show actual bias against him. ......28

III.   The jury had sufficient evidence to convict Ritter of a hate crime and of obstructing a federal investigation. ........31

A.    Abundant evidence showed that Ritter murdered Doe because of Doe's "gender identity."........................32

B.    Abundant evidence showed that Ritter's lies would be communicated to federal authorities. .....................36

1.    Courts have set a low bar to satisfy the "reasonable likelihood" element. ........................38

2.    The evidence here cleared that low bar..............41

3.    Ritter forfeited his vagueness challenge, which fails in any event. ....................................44

CONCLUSION ........................................................................46

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                   **PAGE**

*Bruce v. Warden Lewisburg USP*, 868 F.3d 170 (3d Cir. 2017) ........ 41-42

*Burrage v. United States*, 571 U.S. 204 (2014) ....................................... 33

*Darden v. Barnett*, 74 F.3d 1231 (4th Cir. 1996) (Tbl.) .......................... 21

*Foster v. University of Maryland-E. Shore*,
    787 F.3d 243 (4th Cir. 2015) ...................................................... 20

*Fowler v. United States*, 563 U.S. 668 (2011) .................................. 38, 40

*Greer v. Miller*, 483 U.S. 756 (1987) ....................................................... 16

*Irvin v. Dowd*, 366 U.S. 717 (1961) ......................................................... 27

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) .............................. 30

*Patton v. Yount*, 467 U.S. 1025 (1984) .............................................. 22, 27

*Porter v. White*, 23 F.4th 322 (4th Cir. 2022) ................................... 26-27

*Porter v. Zook*, 898 F.3d 408 (4th Cir. 2018) ......................................... 31

*Poynter by Poynter v. Ratcliff*, 874 F.2d 219 (4th Cir. 1989) ................ 27

*Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006) ..................................... 30

*Skilling v. United States*, 561 U.S. 358 (2010) .................................. 28-29

*Smith v. Phillips*, 455 U.S. 209 (1982) .............................................. 27, 29

*United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018) ............. 13, 19, 21

*United States v. Cabrera-Beltran*, 660 F.3d 742 (4th Cir. 2011) ........... 27

**CASES (continued):** PAGE

*United States v. Chong Lam*, 677 F.3d 190 (4th Cir. 2012) .................. 16

*United States v. Davis*, 75 F.4th 428 (4th Cir. 2023) ...................... 31, 35

*United States v. Diggins*, 36 F.4th 302 (1st Cir. 2022) .......................... 44

*United States v. Dorsey*, 45 F.3d 809 (4th Cir. 1995) ...................... 14, 18

*United States v. Edlind*, 887 F.3d 166 (4th Cir. 2018) .................... 31, 45

*United States v. Foster*, 507 F.3d 233 (4th Cir. 2007) ........................... 40

*United States v. Ince*, 21 F.3d 576 (4th Cir. 1994) ............................ 17-18

*United States v. Malloy*, 758 F.2d 979 (4th Cir. 1985) .................... 21, 29

*United States v. Perry*, 335 F.3d 316 (4th Cir. 2003) ..................... *passim*

*United States v. Rafiekian*, 68 F.4th 177 (4th Cir. 2023) ................ 13, 19

*United States v. Ramos-Cruz,*
   667 F.3d 487 (4th Cir. 2012) ................................................. *passim*

*United States v. Salinas*, 918 F.3d 463 (5th Cir. 2019) ........................ 33

*United States v. Smith*, 723 F.3d 510 (4th Cir. 2013) ........................... 41

*United States v. Smith*, 75 F.4th 459 (4th Cir. 2023) ........................... 45

*United States v. Turner*, 389 F.3d 111 (4th Cir. 2004) ............... 21-22, 26

*United States v. Wallace*, 515 F.3d 327 (4th Cir. 2008) .................... 13-14

**CASES (continued):** PAGE

*Warger v. Shauers*, 721 F.3d 606 (8th Cir. 2013),
    *aff'd*, 574 U.S. 40 (2014) ............................................................. 30

**STATUTES:**

Matthew Shepard and James Byrd, Jr.
  Hate Crimes Prevention Act
    18 U.S.C. 249(a)(2) .................................................. *passim*

18 U.S.C. 924(j)(1) ....................................................................... 9

18 U.S.C. 1512(a)(1)(C) .............................................................. 40

18 U.S.C. 1512(b) .................................................................. 39, 45

18 U.S.C. 1512(b)(3) ........................................................ 9, 32, 37

18 U.S.C. 1512(f)(1) .................................................................... 39

18 U.S.C. 3231 .............................................................................. 2

28 U.S.C. 1291 .............................................................................. 2

34 U.S.C. 30501(1) ..................................................................... 30

34 U.S.C. 30501(9) ..................................................................... 44

# INTRODUCTION

In the summer of 2019, Daqua Ritter tried to keep a secret: he was sleeping with Ernest "Dime" Doe, who dressed and presented publicly as a female. But unlike Ritter, Doe did not want to keep their relationship secret, and others in their small community found out about their intimate affair. This enraged Ritter, who did not want to be perceived as gay. After repeated threats to Doe, Ritter acted—he lured Doe to a remote area and shot Doe three times in the head.

Ritter was charged with violating the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, which criminalizes willfully inflicting bodily injury because of a victim's "actual or perceived . . . gender identity." 18 U.S.C. 249(a)(2). A jury found him guilty of this crime and of using a firearm to commit murder and witness tampering.

On appeal, Ritter claims that the evidence was insufficient to convict him or that he should be granted a new trial. But the trial showcased "overwhelming evidence of his guilt," as the district court ruled in denying these requests. JA1465. The district court's reasoned rulings contain no errors, and the jury's verdicts are sound. This Court should thus affirm Ritter's convictions.

# STATEMENT OF JURISDICTION

This appeal is from a district court's final judgment in a criminal case. *See United States v. Ritter*, No. 23-cr-24 (D.S.C.). The district court had jurisdiction under 18 U.S.C. 3231. The court entered final judgment against defendant-appellant Daqua Ritter on October 21, 2024. JA1478. Ritter filed a timely notice of appeal that same day. JA1484. This Court has jurisdiction under 28 U.S.C. 1291.

# STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion by finding that a curative instruction prevented any prejudice from inadmissible hearsay.

2. Whether the district court abused its discretion by finding that a juror harbored no bias towards Ritter.

3. Whether sufficient evidence proved that Ritter murdered Ernest Doe because of Doe's "actual or perceived . . . gender identity" under 18 U.S.C. 249(a)(2).

4. Whether sufficient evidence proved that Ritter's lies to state police officers about a potential federal crime were reasonably likely to be communicated to federal officers.

## STATEMENT OF THE CASE

This is a hate-crimes prosecution arising from the death of Ernest Doe, also known as "Dime" or "Ernie-Bernie." JA263-264, JA612. Doe "was a biological male" but "identified as a female." JA263-264. Doe dressed "like a full-grown female" and used female pronouns. JA507, JA605. Doe lived in the rural county of Allendale, South Carolina, and "it [was] widely known in Allendale that Dime was transgender." JA539; *see also* JA605, JA612, JA628. Over several years, Doe and Ritter were sexually intimate when Ritter visited Allendale. JA614-616. That relationship ended with Doe's murder, which in turn led to Ritter's arrest and conviction in this case.

### A. Ritter becomes increasingly irate as his relationship with Doe becomes public.

Doe and Ritter had very different views of their relationship. Doe called Ritter a boyfriend and openly discussed their relationship with family and friends. JA606, JA615, JA630. Ritter, though, did not want people to know that he was dating Doe: he did not "present himself to people in Allendale as somebody who would be interested in men [or] . . . transgender women." JA629-JA630, JA632. So Ritter told Doe to delete their text messages, some of which were sexually explicit. JA714-

743.  And at the same time he was secretly seeing Doe, Ritter openly dated women.  JA499-500, JA612-613.

When rumors began to spread in Allendale that Doe and Ritter were in a relationship, Ritter furiously denied it.  JA617-619.  First, when one of Ritter's girlfriends confronted him about Doe, Ritter became very angry, his face turned red, and he exclaimed that he would "beat Dime's ass" for lying.  JA617, JA619.  Ritter called Doe a "faggot" and said that Doe "better stop lying."  JA618.  Second, when another girlfriend challenged him about whether he was having an affair with Doe, Ritter vehemently told the girlfriend not to question his sexuality.  JA512.  Third, Ritter angrily told a male friend that he wanted to beat Doe for telling people they slept together.  JA761, JA763.  Finally, Ritter also confronted Doe about this, texting Doe that he was called a "faggot" by his girlfriend.  JA631; Gov't Ex. 61a.

## B. Ritter murders Doe, destroys evidence, and confesses to family and friends.

Doe became frightened of Ritter, at one point texting him, "no lie, I'm scared [to see you]."  JA718; Gov't Ex. 64a.  But Doe continued to see him anyway.  JA619.  Around a month after Doe expressed fear of Ritter, one of Ritter's friends was asked to get a gun for Ritter to deal with "the

Ernie Bernie situation" ("Ernie Bernie" was Doe's childhood nickname). JA655, JA612. The next afternoon, Doe met Ritter again. JA766-767. Hours later, Doe was found dead, shot three times in the head. JA199-200, JA985. Ritter had been with Doe every step of the way that afternoon:

**August 4, 2019**

**~2:40pm**
- Doe drives to Ritter; Ritter gets in Doe's car with a gun in his pocket (JA763-764, JA767, Gov't Ex. 40a).

**3:01pm**
- Doe is stopped by the police for speeding, with Ritter in the passenger seat (JA240, JA522).

**3:22pm**
- Doe sends a text to a family member about getting a speeding ticket (JA328).

**3:55pm**
- Doe's phone is used to search for information on driver's license points (JA492).

**4:41pm**
- Ritter uses Doe's phone to speak to a friend (JA490, JA770).

**~5:00pm**
- Ritter unexpectedly arrives at his uncle's house, acting strangely, and in a rush to leave (JA907-910).

**6:05pm**
- Just down the street from Ritter's uncle's house, police find Doe's car and discover Doe shot to death, sitting in the driver's seat (JA211, JA288).

After Doe was murdered, Ritter went to a friend's house and burned the clothes he was wearing that day. JA771-773. Ritter also asked his friends to hide his gun (which one friend would not do, thinking that Ritter probably killed someone). JA680-681, JA775-776. Then Ritter deleted nearly 400 text messages on his phone between him and Doe, many showing their romantic relationship (and all of which were later recovered by the FBI). JA714-743.

The day after the murder, Ritter spoke to a close family member and confided in her about murdering Doe. JA874, JA880, JA882. Ritter explained Doe had a picture of him in bed that he did not want posted on social media. JA882, JA895. Ritter also described how he shot Doe once and started to leave—only to realize that Doe was still alive, so he ran back and shot Doe twice more. JA881.

Ritter also told his friends about killing Doe. First, on the night of the murder, Ritter said, "nobody's got to worry about Ernie Bernie any more." JA1014. Second, when Ritter's girlfriend directly asked him if he murdered Doe, Ritter did not deny it—he just smirked. JA520. Ritter's reaction scared his girlfriend and led her to believe that Ritter was involved with Doe's murder. JA521. Third, Ritter told someone else that

he "F'ed up."  JA778.  Finally, Ritter sought reassurance that a friend would not "snitch on him."  JA779.

## C. Ritter repeatedly lies to the police.

Doe's death was investigated by the South Carolina Law Enforcement Division.  JA255, JA262.  This state agency supports local police departments in complex cases like homicides, and it regularly collaborates with federal law enforcement agencies as well.  JA254-255.  The investigating agents who arrived on the scene quickly learned from community members that the victim had been in a relationship with Ritter; so, the agents went to interview him that night.  JA261-262, JA268.

Ritter repeatedly misled the state law enforcement agents about what happened.  JA271, JA279, JA286, JA300.  First, Ritter stated that he had not seen Doe that day, denying that he was in Doe's car.  JA300.  That was a lie; Ritter was sitting next to Doe when a police officer pulled the car over for speeding.  JA522.  Second, Ritter said he spent the afternoon with his aunt.  JA279, JA302.  That too was false.  The woman that Ritter identified as his aunt did not even know him and refuted his alibi.  JA959.  Finally, Ritter told the agents that he met his uncle that

afternoon at a grocery store across town, but that also was a lie—Ritter actually went to his uncle's house, just down the street from where Doe was murdered. JA288, JA301-302.

Further investigation also revealed that Doe had been shot at close range, on the right side of the head and face. JA985, JA991. To Doe's right in the car, the passenger seat was reclined just as when Ritter was sitting there earlier in the day, when Doe was pulled over for speeding. Gov't Exs. 27, 37. Additionally, Ritter's DNA was also recovered from Doe's passenger door. JA1067-1070.

The FBI later joined the investigation into Doe's death and took the lead role. JA547-548. The FBI then arrested Ritter, and he agreed to a voluntary interview. JA1093-1095. Ritter repeated some lies and told new ones, changing his story throughout the interview about the last time he saw Doe. JA1099-1105.

### D.    Ritter is indicted, tried, and convicted.

A federal grand jury charged Ritter with three crimes relating to murdering Doe and attempting to cover it up:

**Count 1, under 18 U.S.C. 249(a)(2)**, for willfully causing bodily injury to Doe because of Doe's gender identity, resulting in death;

**Count 2, under 18 U.S.C. 924(j)(1)**, for using a gun during a crime of violence (under Count 1) to murder Doe; and

**Count 3, under 18 U.S.C. 1512(b)(3)**, for lying to state investigators about Doe's murder.

JA22-25.  At trial, the United States called 29 witnesses; the defense called none.  JA195-1106, JA1136-1137.  The jury convicted Ritter on all counts.  JA1266-1267.

After trial, Ritter moved for acquittal or a new trial, challenging the guilty verdicts on many different fronts:  that the evidence was insufficient to show that Ritter murdered Doe, that the evidence was insufficient to show that Ritter acted because of Doe's "actual or perceived . . . gender identity," that the evidence was insufficient on the witness-tampering charges, that the guilty verdicts represented a manifest injustice, that the verdicts were based on inadmissible and prejudicial hearsay, and that a juror's post-trial statement to the press showed actual bias against him.  JA1298-1302, JA1330-1346.  After conducting an evidentiary hearing on the allegations of juror bias, the district court issued a thorough written ruling rejecting each of Ritter's arguments.  JA1449-1477.

In upholding the jury's guilty verdicts, the district court observed that "the trial evidence overwhelmingly supported the jury's finding that Ritter murdered Dime Doe." JA1457. The court also held that any inadmissible evidence did not affect the verdict because "ample evidence—including forensic, findings, proof of flight, opportunity, motive, and numerous other incriminating statements—remains to support his conviction." JA1465. Finally, the court rejected Ritter's allegations that a juror was biased, finding that juror was credible when answering the court's questions about rendering an impartial verdict. JA1474-1475.

The court sentenced Ritter to life in prison for the hate-crime and firearms counts. JA1478-1479. The court also imposed a 240-month prison sentence on the witness-tampering count, to run concurrently. JA1479. This appeal followed. JA1484.

## SUMMARY OF THE ARGUMENT

Doe's murder is precisely what Congress targeted in the Shepard-Byrd Act, which criminalizes causing bodily injury because of someone's "actual or perceived . . . gender identity." 18 U.S.C. 249(a)(2). The evidence on this and the other counts met—and exceeded—the standards

for conviction.  Although Ritter protests that much of this evidence was circumstantial and that the witnesses did not all testify consistently about what they remembered from four years prior, this Court requires far more to overturn a conviction.  Nothing supports disturbing the jury's verdicts here.

1.    The district court did not abuse its discretion by denying Ritter a new trial after a witness unexpectedly blurted out nonprejudicial hearsay.  First, the district court promptly gave a curative instruction, which mitigated any prejudice.  Second, the substance of the hearsay, that someone heard a rumor that Ritter killed Doe, was not prejudicial because the government introduced many other admissible statements showing that Ritter did indeed kill Doe.

2.    The district court likewise did not abuse its discretion when it rejected Ritter's post-trial accusation that a juror was biased against him.  During jury selection, when the court asked jurors about "gender identity," one juror responded, "I am trans."  JA131.  Ritter did not try to strike that juror for cause or otherwise.  But after Ritter was convicted, he alleged that the juror was biased based on comments the juror made to the press after trial.  The court conducted a thorough evidentiary

hearing, which did not substantiate Ritter's allegations of bias. The court thus reasonably determined that the juror's verdict was based solely on the evidence presented in court.

3. Sufficient evidence existed for the jury to convict Ritter of a hate crime. To begin, Ritter does not contest that the evidence was sufficient to prove that he murdered Doe. Rather, Ritter challenges only whether he did so because of Doe's "gender identity." 18 U.S.C. 249(a)(2). On this element, the jury heard abundant evidence about Ritter's sexual relationship with Doe, Ritter's attempt to keep that relationship secret, Ritter's anger at Doe for disclosing their relationship, and Ritter's comments about not wanting to be perceived as gay. Viewing this evidence most favorably to the government, the jury reasonably inferred that Ritter would not have murdered Doe but for Doe's "gender identity." 18 U.S.C. 249(a)(2).

4. Finally, the evidence on the witness-tampering count was likewise sufficient to sustain the jury's guilty verdict. Here too, Ritter does not dispute the heart of the offense—that he intentionally lied to state police officers about a potential federal crime. Instead, Ritter challenges only whether it was reasonably likely that those lies would be

communicated to federal law enforcement officers. It was. Especially considering that state law enforcement agents did in fact transmit Ritter's statements to federal law enforcement officers—who investigated and arrested Ritter—the jury reasonably determined that this element was satisfied.

## ARGUMENT

I. **The district court did not abuse its discretion by denying a motion for a new trial based on an isolated and unexpected instance of hearsay.**

Ritter first argues that because one witness answered a question with inadmissible hearsay, the district court should have granted him a new trial. Br. 14-20. This Court reviews the denial of a mistrial for abuse of discretion. *See United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008). "Under this standard, we do not substitute our judgment for the district court's; we simply ask whether that court exercised its discretion in an arbitrary or capricious manner." *United States v. Rafiekian*, 68 F.4th 177, 187 (4th Cir. 2023). Evidentiary errors are also subject to harmless error review. *See United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018).

The hearsay here was harmless for two reasons. First, the district court promptly gave a curative instruction. JA932; *see Wallace*, 515 F.3d at 330 (holding that a defendant is not prejudiced by inadmissible evidence "if the jury could make individual guilt determinations by following the court's cautionary instructions" (quoting *United States v. Dorsey*, 45 F.3d 809, 817 (4th Cir. 1995)). Second, other witnesses properly testified to the same information included in the hearsay (that Ritter may have killed Doe), so the hearsay did not impact the guilty verdict. For either or both reasons, the district court did not abuse its discretion by concluding that a new trial "is unequivocally unwarranted." JA927.

## A. The curative instruction mitigated any prejudice from the hearsay.

Ritter's challenge centers on one statement by Kerria Mallory, the long-term girlfriend of Ritter's uncle. JA465-466, JA903. Mallory was at the uncle's house on the day of the murder, and when she left, she drove by the active crime scene down the street. JA910-911. She then called Ritter's uncle to tell him about it. JA911. When the prosecutor asked Mallory how the uncle reacted upon hearing this, Mallory responded, "He said he heard that [Ritter] killed Dime Doe." JA911-912. Defense

counsel immediately objected on hearsay grounds, and the prosecutor candidly responded, "I was not expecting that answer to come out." JA912.

The prosecutor explained that Mallory was expected to repeat her grand jury testimony that Ritter's uncle claimed he had not seen the crime scene (which was a lie, and thus not offered for the truth of the matter asserted) and that he sounded nervous. JA911-912. The court ordered the prosecutor to "clear it up," and the prosecutor then impeached Mallory by reading her grand jury testimony—which did not contain the rumor about Ritter killing Doe. JA913-915. Mallory also acknowledged that she had no idea how Ritter's uncle learned that Doe was dead. JA915. On cross-examination, the defense also used Mallory's grand jury testimony to impeach her, and Mallory confirmed that her testimony in court was different from what she told the grand jury. JA918.

The defense moved for a mistrial, which the district court denied. JA926-927. As the court found, the government did not intentionally elicit the hearsay, and the court emphasized that unexpected statements like Mallory's "happen[] all the time" in trials. JA927. Although the

defense did not request a curative instruction, the court insisted on giving one and allowed the defense to suggest changes to the proposed instruction.  JA927-929.  When the jury came back from lunch, the court told the jury that it must disregard the rumor that Ritter killed Doe:

> I am instructing you to disregard that statement as evidence. **You are to wipe it from your minds as if it was never said.**  It is not evidence. You cannot treat it as evidence.  And you have taken an oath to follow my instructions, so I expect you not to treat it as evidence in any way. All right?  Thank you.  I see you nodding your heads, and I appreciate that.

JA932 (emphasis added).

This curative instruction suffices to cure any prejudice from the hearsay.  A strong presumption exists "that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).  Here, as the district court recounted in its ruling denying a new trial, "the court perceived the jury to have understood its curative instruction, and it ha[d] no reason . . . to believe that the instruction was not heeded."  JA1467.  As this Court has held, it is not "an abuse of discretion for the district court to presume the jury followed these detailed instructions." *United States v. Chong Lam*, 677 F.3d 190, 204 (4th Cir. 2012).

In response (Br. 19-20), Ritter relies primarily on this Court's decision in *United States v. Ince*, 21 F.3d 576 (4th Cir. 1994), but that case is a far cry from what happened here. In *Ince*, the government purposefully solicited inadmissible hearsay that the defendant confessed to the crime. 21 F.3d at 578-585. This Court firmly held that the hearsay merited a new trial because (1) the government intentionally solicited the hearsay, (2) the prosecutor referenced the hearsay in closing, and (3) the hearsay was highly prejudicial because it involved a direct confession from the defendant. *Id.* at 581-582, 584. Nothing of the sort happened here.

First, the district court specifically found that the hearsay was unintentional. JA926-927. Indeed, right after it happened, even Ritter's defense counsel acknowledged that the prosecutor intended to elicit information about the uncle's demeanor, not a statement about who committed the crime. JA930-931. This contrasts sharply with *Ince*, where the government purposely tried to circumvent the rules on hearsay by using "tactics of overkill that fly in the face of direct circuit [court] precedent." *Ince*, 21 F.3d at 582. The government in *Ince* also relied on the hearsay in closing, "thus vitiating any possible curative function that

the judge's limiting instruction might have otherwise served." *Id.* at 584. No such misconduct occurred in Ritter's trial.

Second, *Ince* involved an out-of-court statement that the *defendant himself* confessed to "the critical element of the crime for which he was being tried." 21 F.3d at 581. Here, though, the out-of-court statement did not involve a direct confession from the defendant, but merely a rumor that the defendant committed the crime. Mallory testified only that Ritter's uncle "said he heard that [Ritter] killed Dime Doe." JA912. That's it. Never was there any testimony that the uncle heard a confession from Ritter himself. Indeed, Mallory told the jury that she had no idea where the uncle learned that Doe was dead. JA915.

Ritter, though, claims that the jury *might have inferred* that the uncle's source was Ritter himself. Br. 18-20. Even if that would be a reasonable inference, it is far from the only one, as the district ruled in rejecting this argument. JA1467-1468. As the court explained, the evidence also "showed that rumors implicating Ritter emerged almost immediately" after Doe's body was discovered, so Ritter's uncle could have heard the rumor from any number of people besides Ritter. JA1468. At bottom, this ruling falls well within the "highly deferential view of the

wide discretion accorded to district courts" to decide whether to grant a new trial. *Rafiekian*, 68 F.4th at 187 (citation omitted).

## B.    The hearsay did not influence Ritter's conviction.

Although the curative instruction alone sufficed to mitigate any prejudice to Ritter, the hearsay was also harmless. "An error is harmless if we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Burfoot*, 899 F.3d at 340 (internal quotation marks and citation omitted). Put simply, "an error is harmless if it's highly probable that it did not affect the judgment." *Ibid.* (cleaned up).

In *Burfoot*, this Court found that a witness's hearsay, followed by a curative instruction, was harmless because of the overwhelming other evidence against the defendant. 899 F.3d at 341. So too here. As the district court detailed, "throughout the trial, the jury heard early and often that the Allendale 'rumor mill' quickly identified Ritter as Doe's killer," including Facebook posts identifying Ritter as Doe's killer. JA1467 (citing testimony of witnesses). In fact, the defense highlighted these rumors as part of its theory of the case: that law enforcement and

the community latched onto these rumors and rushed to judgment in pursuing Ritter as a suspect. JA186. So Ritter can hardly claim to be prejudiced by the jury hearing additional testimony about another rumor that he killed Doe.

The jurors also heard testimony—unchallenged on appeal—that much more directly implicated Ritter in Doe's murder. Indeed, a close family member testified that Ritter confessed to shooting Doe. JA874, JA880, JA882. Ritter also told a friend that "nobody will have to worry about Ernie Bernie no more" (JA1013), and that he "F'ed up" (JA778). The jury also heard that Ritter smirked when someone asked whether he killed Doe. JA520. Thus, as the district court aptly concluded, "Mallory's testimony did not 'taint' the verdict." JA1466.

Finally, Ritter includes a footnote in his brief alleging that he was also prejudiced by one other instance of inadmissible testimony. Br. 20 n.11. Even assuming Ritter has not waived this argument by relegating it to a footnote, *see Foster v. University of Maryland-E. Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015), that testimony still would not merit a new trial. That testimony was from an FBI agent who mentioned Ritter's prior arrests, and the court gave a similar curative instruction to

disregard that statement. JA1091. The court later determined that this instruction cured any prejudice and that "the inadmissible statement—even if considered—was 'a drop in a bucket overflowing with evidence.'" JA1469 (quoting *Burfoot*, 899 F.3d at 341). Thus, the hearsay was harmless and cannot justify a new trial.

## II. The district court did not abuse its discretion when it rejected claims of juror bias.

Ritter next seeks a new trial based on purported juror bias, but his arguments crumble under this Court's precedent. To begin, "[a] defendant's right to due process is not violated, and a juror need not be presumed to be biased, merely because a question concerning a juror's partiality is raised after the verdict has been rendered." *Darden v. Barnett*, 74 F.3d 1231, *3 (4th Cir. 1996) (Tbl.). Rather, when potential juror misconduct is alleged after conviction, the defendant bears the burden to show actual bias. *See United States v. Malloy*, 758 F.2d 979, 982 n.6 (4th Cir. 1985).

Where, as here, a district court rejects a defendant's post-conviction allegation of juror bias, that ruling is reviewed for abuse of discretion. *See United States v. Turner*, 389 F.3d 111, 115 (4th Cir. 2004). A court abuses its discretion when it "demonstrates a clear disregard for the

'actual bias' of a juror." *Ibid*. This is an especially difficult standard to meet because "[i]t is the settled law of this circuit that a district judge retains a very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *Ibid*. (internal quotation marks and citation omitted).

The reason district courts have such broad discretion to rule on juror bias is because the issue "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). So when a party challenges a district court's ruling on juror bias, this Court's review "is primarily a matter of ensuring that the judge allowed sufficient information to come forward so that he could exercise his discretion in an informed way." *Turner*, 389 F.3d at 118. The district court here fulfilled this obligation and more, providing Ritter every opportunity to show actual bias and correctly concluding that Ritter failed to make this showing.

## A. The district court thoroughly examined allegations of juror bias.

Ritter's allegations of bias pertain to Juror 71. During jury selection, the court informed the jury pool about the charges against Ritter and asked the jury whether there was any matter related to "gender identity" that should be brought to the court's attention. JA130. Juror 71 approached the bench and stated, "I am trans." JA130-131. The court then asked the juror, "[W]ould your identity as transgender prevent you from rendering a verdict in this case based solely on the evidence that you see in this courtroom and the law as I give it to you?" JA131. The juror answered, "No." JA131. The court gave Ritter's counsel an opportunity to ask questions, but that was declined. JA131. Neither party sought to exclude this juror, who was seated on the jury. JA1290, JA1450-1451.

After the trial, this juror spoke to the media about the trial. JA1303-1308 (AP article), JA1401-1406 (The State article). The AP article recounted that the juror "understands firsthand the real-world harm caused by the stigma still attached to being a transgender person." JA1307. The juror was also quoted as saying, "In my personal experience, it can be dangerous for transgender women to date." JA1307.

The juror also commented, "We are everywhere. If one of us goes down, there'll be another one of us on the jury." JA1306.

The State article reported that the juror had not decided whether Ritter was guilty before deliberations started. JA1403. As the juror told The State, Ritter "was innocent until I was absolutely sure beyond a reasonable doubt that he was proven guilty." JA1403. The reporter also asked whether the juror's "gender identity" played a role in the verdict. JA1405. The juror responded: "I wish I had this great angle to give you as a reporter, that my gender identity weighed on this heavily and I saw myself in the victim, but honestly, it didn't." JA1405. Rather, the juror stated, "I followed the evidence and law and followed the judge's instructions and did what was asked of me and came to that conclusion." JA1405.

After the juror made these comments, the district court granted Ritter's request for an evidentiary hearing to probe for potential bias. JA1277-1297. The juror appeared with counsel, and the court asked the juror 11 questions about whether the juror answered truthfully when responding to the jury questionnaire, the questions at sidebar, the questions directed to the whole jury pool, and the affirmation about being

impartial.  JA1282-1286, JA1293-1295.  Each time, the juror declared that the earlier answers were truthful and honest.  JA1282-1286, JA1293-1295.

The court also thoroughly questioned the juror about the statements to the media, asking what the juror meant and whether those comments were consistent with the juror's earlier answers at voir dire. JA1287-1289, JA1294-1295.  The juror explained that although the articles contained accurate quotations, the quote about "real-world harm" did not refer to the juror's own personal experience.  JA1294-1295, JA1307.  Rather, the juror simply sought to "call[] attention to violence against trans women in general."  JA1295.  The juror also unequivocally stated that "[m]y status as a transgender person did not affect my ability to be a fair and impartial juror" (JA1289), and the juror disavowed any bias towards Ritter (JA1294).

After the hearing, the court ruled that Ritter failed to show actual bias for several reasons.  First, the juror's "tone, demeanor, and responsiveness" during the hearing showed that the juror was honest when answering questions.  JA1476.  Second, the juror was credible in "statements in [the juror's] questionnaire, during jury selection, at

sidebar, and on numerous occasions at the post-trial hearing." JA1474.

Third, the juror spoke to the press only "*after* a verdict was rendered."

JA1474. Fourth, the juror's "posttrial efforts do not prove [the juror] had

any pre-trial 'agenda" that influenced [the juror's] decision-making."

JA1474. Finally, the juror's answers at the evidentiary hearing did not

conflict with the juror's assurances about rendering a fair verdict.

JA1475.

### B. The district court committed no manifest error by ruling that Ritter failed to show that the juror was biased.

Although Ritter argues that the district court reached the wrong

answer on bias, he does not point to any evidence that the district court

overlooked. This dooms his argument that the district court abused its

discretion. *See Turner*, 389 F.3d at 118 (explaining that appellate review

of a bias determination "is primarily a matter of ensuring that the judge

allowed sufficient information to come forward so that he could exercise

his discretion in an informed way").

"Actual bias, or bias in fact, exists when a juror, because of his or

her partiality or bias, is not capable and willing to decide the case solely

on the evidence before him or her." *Porter v. White*, 23 F.4th 322, 327

(4th Cir. 2022) (cleaned up). "A juror is presumed impartial[,] and the existence of a preconception is insufficient to rebut this presumption if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 221 (4th Cir. 1989) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

Here, no dispute exists that the juror repeatedly confirmed the ability to be impartial. And as the Supreme Court has emphasized, courts should not lightly discount a juror's expressed belief that the juror can be impartial. *See Smith v. Phillips*, 455 U.S. 209, 217 n.7 (1982). To be sure, just because jurors say they are impartial does not always mean they actually are impartial, but that is a question of credibility for a trial court to resolve. *See United States v. Cabrera-Beltran*, 660 F.3d 742, 749 (4th Cir. 2011) ("The trial judge is in the best position to make judgments about the impartiality and credibility of potential jurors based on the judge's own evaluations of responses to questions.") (cleaned up). For this reason, a trial court's resolution of juror credibility is entitled to "special deference." *Patton*, 467 U.S. at 1038 (citation omitted).

Special deference is also warranted because "[r]eviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling v. United States*, 561 U.S. 358, 386 (2010). Here, the district court did just that: "Having evaluated Juror 71's tone, demeanor, and responsiveness during its evidentiary inquiry, the court is satisfied that [the juror] did not give a dishonest answer." JA1476; *see also* JA1474 (finding the juror "credible" when answering the "questionnaire, during jury selection, at sidebar, and on numerous occasions at the post-trial hearing"). Ritter identifies nothing in the record that would justify disturbing this credibility determination.

## C. Ritter's speculation about the juror's personal experiences do not show actual bias against him.

Although Ritter does not dispute that the district court considered all the material evidence, he argues that the district court nonetheless reached the wrong conclusion. Br. 24. Ritter primarily relies on a concurring opinion by Justice O'Connor, who observed that sometimes a "juror may have an interest in concealing his own bias" or "may be

unaware of it." *Ibid.* (quoting *Smith*, 455 U.S. at 221-222 (O'Connor, J.,
concurring)).  Ritter then suggests that the juror's comments to the press
reflect this type of bias (Br. 24-25), but this flawed argument falls apart
on multiple fronts.

*First*, when Justice O'Connor discussed the potential for a juror to
be unaware of their own bias, she was discussing "*implied* bias," not
*actual* bias.  *Smith*, 455 U.S. at 222 (emphasis added).  Although implied
bias may sometimes justify striking a potential juror for cause, it has no
role in this postconviction proceeding, where *actual* bias must be proven.
*See Malloy*, 758 F.2d at 982 n.6 ("After *Smith v. Phillips*, we and other
courts have required a showing of actual bias in cases involving alleged
juror impartiality after a verdict has been reached.").  This is reason
enough to discard Ritter's challenge.

*Second*, Ritter wrongly suggests that the juror's "actions in
advocating on the issue of violence against transgender women"
demonstrated bias against *him*.  Br. 25.  Contrary to Ritter's
characterization, the juror never said anything about
"advocating . . . against people like Ritter."  Br. 25.  Rather, the juror
simply stated that "in my personal experience, it can be dangerous for

transgender women to date." JA1307. The juror's awareness about this "real-world harm" (JA1307) does not establish that the district court abused its discretion. Indeed, when Congress enacted the Shepard-Byrd Act—the statute under which Ritter was charged—Congress codified its finding that "violence motivated by the actual or perceived . . . gender identity . . . of the victim poses a serious national problem." 34 U.S.C. 30501(1).

*Third*, "[j]urors are not expected to come into the jury box and leave behind all that their human experience has taught them." *Robinson v. Polk*, 438 F.3d 350, 364 (4th Cir. 2006) (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 149 (1994) (O'Connor, J., concurring)). In fact, "in certain cases a person's gender and resulting life experience will be relevant to his or her view of the case" as a juror. *J.E.B.*, 511 U.S. at 149 (O'Connor, J., concurring). "Individuals are not expected to ignore as jurors what they know as men—or women." *Ibid.*

In the end, when it comes to the personal experiences of jurors, "it is unavoidable they will bring such innate experiences into the jury room." *Warger v. Shauers*, 721 F.3d 606, 611 (8th Cir. 2013), *aff'd*, 574 U.S. 40 (2014). That is why "a post-verdict inquiry into intrinsic juror

influences is almost never justified." *Porter v. Zook*, 898 F.3d 408, 447 (4th Cir. 2018) (Shedd, J., concurring) (alteration and citation omitted). The district court thus went above and beyond when searching for any potential bias by the juror, and the court committed no manifest abuse of discretion by finding that the juror put aside personal opinions and rendered a verdict based on the evidence presented in court. JA1475.

## III. The jury had sufficient evidence to convict Ritter of a hate crime and of obstructing a federal investigation.

Ritter also challenges the district court's denial of his motion to acquit based on the sufficiency of the evidence, which means he "must overcome a heavy burden." *United States v. Edlind*, 887 F.3d 166, 172 (4th Cir. 2018) (citation omitted). This Court reviews sufficiency challenges de novo and will reverse only in "the rare case where the prosecution's failure is clear." *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023) (citation omitted). In other words, "a court of appeals is obliged to sustain a guilty verdict if—viewing the evidence in the light most favorable to the prosecution—the verdict is supported by substantial evidence." *Ibid.* (internal quotations marks and citation omitted).

Substantial evidence exists here to support the jury's verdict. As the district court detailed when rejecting Ritter's motion for acquittal, "the jury's verdict was heavily supported by the Government's evidence." JA1453; *see also* JA1465 (referencing the "overwhelming evidence of [Ritter's] guilt"). Indeed, on appeal Ritter does not challenge the district court's ruling that sufficient evidence existed to show that he murdered Doe and that he intentionally lied about it to law enforcement officers.

Rather, Ritter limits his sufficiency challenge to two discrete issues: (1) on the hate-crime count, whether sufficient evidence showed that he murdered Doe because of Doe's "gender identity"; and (2) on the obstruction count, whether sufficient evidence showed that his lies to state law enforcement officers were reasonably likely to have been communicated to federal officers. 18 U.S.C. 249(a)(2) and 1512(b)(3). As detailed below, the jury had more than enough evidence to reasonably conclude that these elements were satisfied.

### A. Abundant evidence showed that Ritter murdered Doe because of Doe's "gender identity."

For the hate-crime charge in Count 1, the government needed to prove four elements beyond a reasonable doubt:

1) Ritter willfully caused bodily injury to Doe;

2) Ritter acted because of Doe's "actual or perceived . . . gender identity";

3) Ritter used a firearm that had traveled in interstate commerce; and

4) Ritter's conduct resulted in Doe's death.

18 U.S.C. 249(a)(2); JA1162-1163 (jury charge). On appeal, Ritter challenges only the second element, regarding his motive. Br. 26-29. This element requires but-for causation, meaning that the government needed to prove "that the bodily harm would not have occurred but for the fact of the victim's actual or perceived gender identity." JA1165 (jury instructions); Br. 27 (agreeing that but-for causation applies).

As the unchallenged jury instructions explained, the government did *not* need to show that Doe's "actual or perceived gender identity" was the "sole or only motive for the bodily harm." JA1165. Rather, this element required only that Doe's "actual or perceived gender identity" "played a determinative role" in Ritter's decision to harm Doe. JA1165. Even a very minor factor can be determinative if, "so to speak, it was the straw that broke the camel's back." *Burrage v. United States*, 571 U.S. 204, 211 (2014). Thus, as other courts have recognized, but-for causation "is not a difficult burden to meet." *United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019).

Here, the evidence easily surpassed this threshold. Indeed, the heart of why Ritter murdered Doe was because Ritter did not want anyone to know that he was sleeping with someone whom "[e]veryone knew" "was transgender." JA605. As the district court detailed in its ruling, "substantial evidence" showed that "Ritter was motivated by Doe's actual or perceived gender identity" when he killed Doe. JA1457. The jury heard, for example, that:

- Ritter had a romantic relationship with Doe, who was "widely known" to be transgender, and Ritter tried to keep that relationship a secret (JA605-606, JA714-743; Gov't Ex. 64);

- Ritter openly dated women, and he did not keep those relationships secret (JA499-500, JA904);

- Ritter lied to his girlfriends about his relationship with Doe because he did not want them to think he slept with men, and when one girlfriend asked about his relationship with Doe, he angrily told her not to question his sexuality (JA512, JA632);

- Ritter became infuriated at Doe for not hiding their relationship, letting Doe know that he had been called a "faggot" (JA617-619, JA631);

- Less than a week before killing Doe, Ritter told his friends that he was going to "catch" Doe and "beat" Doe for telling people that they slept together (JA760-761);

- Right before shooting Doe, Ritter confronted Doe about a picture on Doe's phone showing him in bed with Doe that he did not want posted on social media (JA882, JA895); and

- After killing Doe, Ritter repeatedly expressed concern that people would think he was gay (JA677-678, JA778).

In his brief, Ritter first argues that none of this shows that "[he] had a problem with Doe being transgender." Br. 28. But the government was not required to prove that Ritter "had a problem with Doe being transgender." Rather, the government needed to prove only that Doe's "actual or perceived gender identity" "played a determinative role" in Ritter's decision to harm Doe. JA1165. So it does not matter whether Ritter "had a problem with Doe being transgender." Br. 28. What matters is whether Ritter would not have killed Doe but for Doe's "gender identity." 18 U.S.C. 249(a)(2). On this point, the evidence above allowed the jury to reasonably infer that the answer is yes.

Ritter also tries to minimize the evidence against him, claiming that it merely shows the "ups and downs in Doe and Ritter's relationship" (Br. 28), or that he simply wanted "to keep another relationship secret from his girlfriend" (Br. 29). These arguments fail twice over. First, they improperly view the evidence in Ritter's favor, not, as this Court requires, in favor of the verdict. *See Davis*, 75 F.4th at 437. Second, as the unchallenged jury instructions explained, Ritter could be found guilty even if he had more than one reason for harming Doe. JA1165. So Ritter

could have wanted to keep his relationship with Doe a secret *and* killed Doe because of Doe's "gender identity." 18 U.S.C. 249(a)(2).

Indeed, the evidence established that the very reason Ritter wanted to keep his relationship with Doe a secret is because in Allendale, it was "well-known that Dime was transgender." JA628. For example, when Ritter's girlfriend confronted him about his relationship with Doe, Ritter did not respond by telling his girlfriend not to question his fidelity; he responded by telling her not to question his sexuality. JA512. And when Ritter told Doe about his girlfriend finding out about the relationship, Ritter complained about being called a "faggot[]," not a cheater. JA631. Even after he killed Doe, Ritter expressed concern about being called gay, not a murderer. JA677-678, JA778. Combined with Ritter threatening Doe, calling Doe a "faggot," and killing Doe right after seeing a video of the two together in bed that Ritter wanted to keep secret, a jury could and did reasonably infer that Ritter murdered Doe because of Doe's "gender identity," as the statute requires. 18 U.S.C. 249(a)(2).

## B. Abundant evidence showed that Ritter's lies would be communicated to federal authorities.

Extensive evidence also allowed the jury to reasonably conclude that Ritter was guilty of obstructing a federal investigation under

18 U.S.C. 1512(b)(3), as charged in Count 3 of the indictment. For this count, the government needed to prove four elements beyond a reasonable doubt:

1) Ritter knowingly engaged in misleading conduct towards another person;

2) Ritter acted with the intent to hinder, delay, or prevent communication of information to a law enforcement officer;

3) It was reasonably likely that the information would have been transferred to a federal law enforcement officer or judge; and

4) The information related to the commission or possible commission of a federal offense.

JA1172-1173 (Jury Charge); *United States v. Perry*, 335 F.3d 316, 322 (4th Cir. 2003).

On appeal, Ritter does not contest that he engaged in misleading conduct, that he acted with the requisite intent to obstruct information from being communicated to a law enforcement officer, or that his lies related to a federal crime. Instead, his sole sufficiency challenge is to the third element, whether it was reasonably likely that the false information would be transferred to a federal law enforcement officer. Br. 30. It was.

As the district court correctly concluded, "where Ritter misled officials about a federal hate crime in a state where federal and state officials work closely together and where no direct statutory analogue

was available for state prosecution—a rational trier of fact could certainly find a reasonable likelihood that federal law enforcement would become involved." JA1463-1464. Ritter's challenge to this well-reasoned holding rests on faulty legal premises and an incomplete view of the record.

### 1. Courts have set a low bar to satisfy the "reasonable likelihood" element.

To show that there was "a reasonable likelihood" of communication to a federal officer, the government needed to prove only that "the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Fowler v. United States*, 563 U.S. 668, 677-678 (2011) (emphasis omitted). That's it. "[T]he government does *not* need to show '*beyond a reasonable doubt* (or even that it is *more likely than not*) that the hypothetical communication would have been to a federal officer.'" *United States v. Ramos-Cruz*, 667 F.3d 487, 497 (4th Cir. 2012) (quoting *Fowler*, 563 U.S. at 674). Put simply, when more than a "mere possibility" exists that the statement will be communicated to federal officers, the element is satisfied. *Fowler*, 563 U.S. at 676.

Ritter, though, tries to set the bar higher, arguing that the government also needed to show that the local officers knew his

statements were related to a federal investigation. Br. 31. Not so. "Nothing in § 1512(b)(3) suggests that the recipient of the deceptive information must be involved in an ongoing federal investigation, or in an investigation of a federal crime." *Perry*, 335 F.3d at 322 n.9. After all, the plain text of the statute specifies that "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. 1512(f)(1). Thus, "the government need not prove that a federal investigation was in progress at the time the defendant committed witness[]tampering." *Ramos-Cruz*, 667 F.3d at 498 (interpreting Section 1512(a)(1)(C)).

Ritter identifies no cases adopting his argument that Section 1512(b)(3) requires proof that the recipient of the false information "considered the possibility this would become a federal case or that the information [he] provided would be transferred to a federal agent." Br. 31. This absence of supporting authority is unsurprising because Ritter's argument misunderstands the statute's purpose. As this Court has explained, a prosecution under Section 1512(b)(3) "is based on the federal interest of protecting the integrity of potential federal investigations." *Perry*, 335 F.3d at 321 (citation omitted). That integrity is compromised

by lying to cover up a crime, which "may prove more serious (and more effective) when . . . the precise communication and nature of the officer who may receive it are not yet known." *Fowler*, 563 U.S. at 673.

Applying these principles, this Court has held that "to require that federal and state officials had been cooperating at the time of [a] murder would undermine the deterrent purpose of the statute." *Ramos-Cruz*, 667 F.3d at 498 (interpreting Section 1512(a)(1)(C)). Likewise, this Court has rejected the argument that a victim of witness tampering needed to know that he was part of a federal investigation. *See United States v. Foster*, 507 F.3d 233, 249 (4th Cir. 2007). Thus, contrary to Ritter's argument (Br. 30-31), the "reasonable likelihood" element does not require any proof that the recipient of the false statements knew that the lies might later be transferred to federal authorities.

In fact, the reasonable likelihood element can be satisfied even when the false information never makes it to a federal officer. *See Perry*, 335 F.3d at 322 n.9. So it does not matter that 11 months elapsed between when state officers began investigating Doe's murder and when they communicated with federal agents. Br. 31. Section 1512 does not require a federal investigation to be "imminent." *Perry*, 335 F.3d at 322

n.9. (citation omitted); *see also Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 188 (3d Cir. 2017) (finding the reasonable-likelihood element satisfied when two years elapsed between the crime and the involvement of federal authorities).

In short, to satisfy the reasonable-likelihood element, the government must show only that more than a remote, outlandish, or simply hypothetical possibility existed that the lies would be passed along to federal officers.

## 2. The evidence here cleared that low bar.

Viewed through the correct legal lens, the evidence here easily cleared the "relatively low bar" to satisfy the "reasonable likelihood" element. *United States v. Smith*, 723 F.3d 510, 518 (4th Cir. 2013). And that low bar now becomes a high hurdle for Ritter because on appeal he bears the burden to show that no reasonable jury could have convicted him.

Ritter does not get past the starting gate given his concessions. First, he does not contest that the evidence was sufficient to show that he intentionally misled state police officers to cover up a potential federal crime. Br. 31. Second, Ritter does not dispute that his lies were in fact

communicated to federal officials who investigated Doe's murder.  JA255.

So the jury had a sound basis to infer that a reasonable likelihood existed

that Ritter's lies would be communicated to federal officers.

As this Court held in *Ramos-Cruz*, when federal officials join an

ongoing local investigation, and when "local authorities investigating the

underlying crime are actively cooperating with federal law enforcement

officers, the reasonable likelihood standard is met."  *Ramos-Cruz*, 667

F.3d at 499.  Other courts have likewise concluded that "the fact that a

federal investigation ultimately occurred . . . is probative evidence of the

likelihood that [the victims] would have eventually communicated with a

federal officer."  *Bruce*, 868 F.3d at 186.

Here, the jury not only heard evidence that local and federal officers

collaborated in this case, but also that this type of cooperation routinely

occurred in other cases.  For example, the lead state agent testified that

he and his fellow officers "share information all the time" with federal

law enforcement officers.    JA255; *see also* JA345, JA362-363.    This

pattern of cooperation between local and federal law enforcement further

reinforces the jury's verdict on the reasonable-likelihood element.  *See*

*Perry*, 335 F.3d at 321 n.8 (affirming Section 1512(b)(3) conviction when

the evidence showed regular communications between local and federal law enforcement officers).

Although the undisputed cooperation between state and federal officers here would be enough to affirm Ritter's conviction under Section 1512, there was more. This was not a mundane offense, but a *federal hate crime where someone died*. As this Court held in *Perry*, the federal nature of the crime is another factor that can support a conviction under Section 1512(b)(3). *See Perry*, 335 F.3d at 321 n.8. That is especially important here because South Carolina does not have an equivalent hate-crimes law. In other words, because the federal government had exclusive jurisdiction over a potential hate crime, the jury could have concluded that it was reasonably likely that Ritter's statements would eventually be passed along to federal officers.

Ritter tries to downplay his violation of the Shepard-Byrd Act, stating that South Carolina's murder statute provided the same penalty. Br. 32. But "the fact that the underlying crime could have been prosecuted under both state and federal law" does not undermine a finding that a reasonable likelihood existed that the communication would be passed along to federal officers. *Ramos-Cruz*, 667 F.3d at 498.

In fact, Congress intended for the Shepard-Byrd Act to promote cooperation between state and federal authorities: "Federal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes." 34 U.S.C. 30501(9); *see also United States v. Diggins*, 36 F.4th 302, 316 (1st Cir. 2022) (recognizing that the Shepard-Byrd Act "is a cornerstone of a scheme of cooperative federalism, representing an ordinary example of one of many parallel state and federal penal laws").

In sum, Ritter's bias-motivated murder—a *federal* hate crime—provided an ample basis for the jury to reasonably conclude that when Ritter intentionally lied to local officers, a reasonable likelihood existed that those false statements would be passed along to federal officers. As the district court ruled, the evidence proved that "it is certainly more than remote, outlandish, or simply hypothetical that the communication would occur to a . . . federal officer." JA1133.

### 3. Ritter forfeited his vagueness challenge, which fails in any event.

Finally, this Court should reject Ritter's one-sentence argument that the witness-tampering statute would be void for vagueness under

these circumstances. Br. 32-33. First, "a party forfeits an argument by failing to develop it in the opening brief, even if its brief takes a passing shot at the issue." *United States v. Smith*, 75 F.4th 459, 468 (4th Cir. 2023) (internal quotation marks and citation omitted). Second, as the district court correctly held when rejecting this identical one-sentence argument, "due process is satisfied by the statute's *mens rea* requirement and by its clear aim at conduct obstructing investigations into federal offenses." JA1464 n.7.

As this Court held when affirming a Section 1512(b) conviction in another case, the line between innocent and criminal conduct under the statute turns on whether someone was "acting with wrongful, immoral, depraved, or evil intent." *Edlind*, 887 F.3d at 173 (internal quotation marks and citation omitted). Here, Ritter does not challenge that he acted with the requisite intent when he lied to state law enforcement agents about a federal crime (Br. 30). He thus had fair notice that his actions were illegal.

# CONCLUSION

This Court should affirm Ritter's convictions.

Respectfully submitted,

BRYAN P. STIRLING
  United States Attorney
  District of South Carolina

BENJAMIN N. GARNER
  Assistant U.S. Attorney
  District of South Carolina

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General

s/ Brant S. Levine
ANDREW G. BRANIFF
BRANT S. LEVINE
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-4373
  Brant.Levine@usdoj.gov

Date:  July 25, 2025

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose Ritter's request for oral argument.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 9971 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Brant S. Levine
BRANT S. LEVINE
Attorney

Date: July 25, 2025