No. 24-4576

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

DAQUA LAMEEK RITTER

*Appellant,*

v.

UNITED STATES

*Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

_____

**REPLY BRIEF OF APPELLANT
DAQUA LAMEEK RITTER**

_____

Lindsey S. Vann
JUSTICE 360
900 Elmwood Avenue, Suite 200
Columbia, SC 29201
(803) 765-1044
lindsey@justice360sc.org

*Counsel for Appellant*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

REPLY ARGUMENT ........................................................................................1

    I.     Witness Kerria Mallory's Statement that Ritter's Uncle Heard Ritter Killed the Victim Amounted to a Hearsay Confession by Ritter that Could not be Cured by a Curative Instruction and Swayed the Jury to Convict ......................................................................................1

             a.  The Government's Inadvertent Elicitation of the Hearsay Statement Does Not Negate the Error or its Harm ............1

             b.  The Government Ignores the Context of the Hearsay and Other Trial Testimony in an Unsuccessful Attempt to Minimize the Harm ............................................................2

             c.  The Error Was Not Harmless and Warrants Reversal ......4

    II.    The District Court Manifestly Abused its Discretion in Denying Ritter a New Trial on the Basis of Juror 71's Bias .........................................10

    III.   Insufficiency of the Evidence on Any Element is Sufficient to Undermine the Validity of a Conviction .............................................14

CONCLUSION ...............................................................................................14

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Federal Cases

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ................................................................. 6

*Bruton v. United States*, 391 U.S. 123 (1968) ............................................................... 7

*Darden v. Barnett*, 74 F.3d 1231 (4th Cir. 1996) ........................................................ 12

*Kotteakos v. United States*, 328 U.S. 750 (1946) ......................................................... 5

*Pearson v. Miller*, 854 F.2d 656 (4th Cir. 1988) ......................................................... 12

*Porter v. Gilmore*, 479 F. Supp. 3d 252 (E.D. Va. 2020) ........................................... 11

*Porter v. White*, 23 F.4th 322 (4th Cir. 2022) ............................................................. 10

*Porter v. Zook*, 898 F.3d 408 (4th Cir. 2018) ............................................................. 11

*Smith v. Phillips*, 455 U.S. 209 (1982) ................................................................. 11, 12

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ................................................................ 14

*United States v. Brevard*, 739 F.2d 180 (4th Cir. 1984) ........................................... 1, 6

*United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018) ................................................ 4

*United States v. Chong Lam*, 677 F.3d 190 (4th Cir. 2012) ......................................... 6

*United States v. Dorsey*, 45 F.3d 809 (4th Cir. 1995) ................................................... 4

*United States v. Ince*, 21 F.3d 576 (4th Cir. 1994) ....................................... 1, 4, 5, 6, 7

*United States v. Lawhorne*, 29 F. Supp. 2d 292 (E.D. Va. 1998) ............................... 11

*United States v. Malloy*, 758 F.2d 979 (1985) ............................................................ 12

*United States v. Porter*, 821 F.2d 968 (4th Cir. 1987) .................................................. 4

*United States v. Nyman*, 649 F.2d 208 (4th Cir. 1980) ................................... 4, 5, 7, 14

*United States v. Turner*, 389 F.3d 111 (4th Cir. 2004) ......................................... 12, 13

*United States v. Wallace*, 515 F.3d 327 (4th Cir. 2008) ............................................... 4

*United States v. West*, 877 F.2d 281 (4th Cir. 1989) .................................................4

## Statutes and Rules

18 U.S.C. § 1512 ..................................................................................................8

Federal Rule of Evidence 403 ...............................................................................1

# REPLY ARGUMENT

I. **WITNESS KERRIA MALLORY'S STATEMENT THAT RITTER'S UNCLE HEARD RITTER KILLED THE VICTIM AMOUNTED TO A HEARSAY CONFESSION BY RITTER THAT COULD NOT BE CURED BY A CURATIVE INSTRUCTION AND SWAYED THE JURY TO CONVICT.**

   a. *The Government's Inadvertent Elicitation of the Hearsay Statement Does Not Negate the Error or its Harm.*

As an initial matter, the Government asks this Court to disregard the erroneous admission of Kerria Mallory's hearsay testimony that Ritter's uncle said he "heard that Daqua killed Dime Doe" because it was not intentionally elicited by the Government. *See* Br. for U.S. as Appellee, at 17 (Doc. No. 46) [hereinafter Resp. Br.]. Intentionality is not determinative. While the Court in *United States v. Ince* noted that the Government's elicitation of otherwise inadmissible hearsay to impeach a witness was likely a tactic to circumvent hearsay rules, the Court explicitly stated "[f]ederal evidence law does *not* ask the judge, either at trial or upon appellate review, to crawl inside the prosecutor's head to divine his or her true motivation." 21 F.3d 576, 580 (4th Cir. 1994) (emphasis original). Instead, the Court instructed trial courts to apply the rules of evidence—Rule 403 in *Ince*—to determine the admissibility of testimony. *Id.* Then, because the Court found the hearsay testimony violated Rule 403, the Court went on to determine the error was not harmless, doing so without referencing the Government's intentions in eliciting the testimony. *Id.* at 583–85; *see also United States v. Brevard*, 739 F.2d 180, 181 (4th Cir. 1984) (reversing a conviction where the government's witness repeatedly

referenced an inadmissible polygraph examination, despite the prosecutor's explicit instruction not to do so). Here, the trial court properly ruled the hearsay testimony provided by Mallory was inadmissible, despite the inadvertent nature of its elicitation. JA932. The question before this Court, therefore, is whether the error was harmless to Ritter (which it was not) regardless of the Government's intent in eliciting the erroneous testimony.

> b. *The Government Ignores the Context of the Hearsay and Other Trial Testimony in an Unsuccessful Attempt to Minimize the Harm.*

In arguing the error was harmless, the Government repeats the district court's erroneous factual considerations, asserting that the statement made by Ritter's uncle (Kalvin Peeples), and testified to by Mallory, did not amount to a confession from Ritter. Specifically, the Government argues it is just as likely the jury interpreted Peeples's statement—that "he heard that [Ritter] killed Dime Doe"—to mean Peeples had heard Ritter was the culprit through the rumor mill. Resp. Br. at 18. Of course, it is impossible to know the basis of Peeples's statement because he was not the one testifying and could not be asked—that is the problem with hearsay testimony and why the statement was deemed inadmissible—but a review of Mallory's testimony and the context in which it was given clearly shows her statement would be interpreted by the jury as a confession by Ritter.

The reasonable inference from this testimony is that Peeples relayed information he received from Ritter himself. When Mallory repeated what Peeples

said on the phone, it was after she testified that Peeples told her "he had to take Daqua uptown to the store." JA909. Peeples did not take anyone other than Ritter with him, and there was no testimony that he spoke with anyone else during the trip. *See* JA909–912. Mallory further testified the store was about twenty minutes away, she left the house about thirty minutes after Peeples left, and she called him while still driving down Peeples's road away from his home. JA910–911. Accordingly, at the time of the call, Peeples had just dropped Ritter off after spending approximately twenty of the past thirty minutes with him and offered no indication he spoke with anyone else during that time, making Ritter the most likely source of the information.

Additionally, the Government argued Ritter arrived at Peeples's house "[r]ight after the murder." JA1190. According to the Government's theory, Ritter answered a call on Doe's phone at 4:41 p.m., then walked the half mile to Peeples's house, and then left in a rush with Peeples. *See* JA288, JA770, JA908–909. Within about thirty minutes, Mallory called Peeples. JA910–911. By that timeline, law enforcement would have just responded to the scene—too early for rumors to be circulating about the perpetrator. *See* JA211 (Sheriff Freeman testifying he was the first to arrive at the scene at 6:05 p.m.). Even if Mallory called Peeples later in the evening, lead investigating Agent Lawrence Wiggins disagreed that Ritter's name had been circulating as a suspect by the time he interviewed Ritter later that night, well after

3

Ritter was dropped off by Peeples. JA 278, JA374.[1] Based on Mallory's testimony and the other testimony placing it in context, the only reasonable inference from her statement was that Peeples said Ritter confessed to committing the murder. "It is hard to imagine any piece of evidence that could have had a greater prejudicial impact than such a supposed naked confession of guilt." *Ince*, 21 F.3d at 581.

    c. *The Error Was Not Harmless and Warrants Reversal.*

Contrary to the Government's assertions, the error was not harmless.[2] In determining whether an error is harmless, "[t]he decisive factors to be considered are the 'closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.'" *United States v. Burfoot*, 899 F.3d 326, 340–41 (4th Cir. 2018) (quoting *United States v. Nyman*, 649 F.2d 208, 212 (4th

---

[1] Ritter relied on this same testimony—that Agent Wiggins disagreed about the speed at which Ritter's name began circulating—in his opening brief but made a typographical error in citing to the Joint Appendix page. *See* Br. at 18 ("JA454 (Agent Wiggins's testimony disagreeing that Ritter's name got around that fast)"). The brief citation should have been to Agent Wiggins's testimony on JA374.

[2] The Government asserts that the error was harmless because "the district court promptly gave a curative instruction," relying on *United States v. Wallace* for the proposition that "if the jury could make individual guilt determinations by following the court's cautionary instructions," there is no prejudice from inadmissible evidence. Resp. Br. at 14 (quoting *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008) (quoting *United States v. Dorsey*, 45 F.3d 809, 817 (4th Cir. 1995))). The "individual guilt determination" language, however, originates in the context of appellate review of a denial of a motion to sever co-defendants' trials and should not apply in the context of Ritter's trial. *See, e.g.*, *United States v. West*, 877 F.2d 281, 288 (4th Cir. 1989); *United States v. Porter*, 821 F.2d 968, 972 (4th Cir. 1987).

Cir. 1980)). The appropriate test "[i]n the realm of nonconstitutional error" is whether the Court finds "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgement was not substantially swayed by the error." *Nyman*, 649 F.2d at 211–12 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "It is important to keep in mind that it does not ask whether [the Court] believe[s] that irrespective of the error there was sufficient evidence to convict, but whether . . . [the Court] believe[s] it highly probable that the error did not affect the judgement." *Id.* at 212 (internal quotation marks omitted).

The error was unquestionably central to the case. At bottom, the question before the jury was who killed Doe. The Government argued it was Ritter; Ritter argued he was no longer with the victim at the time of her death. Thus, a confession to his uncle that Ritter killed Doe went to *the* central issue of the case. *See, e.g.*, *Nyman*, 649 F.2d at 212 (recognizing the centrality of testimony "offered to impeach two identifying witnesses"); *Ince*, 21 F.3d at 583 (finding a hearsay confession that the defendant fired the gun central where the Government argued the defendant was the person who fired the gun and the defendant argued it was another person).

Though the trial court took steps to mitigate the inadmissible hearsay by issuing a curative instruction, it was insufficient to cure the error. "Curative instructions . . . are not always adequate. There are instances where the jury is

5

exposed to inadmissible evidence which could make such a strong impression that instructions to disregard it may not remove its prejudicial effect."[3] *Brevard*, 739 F.2d at 182. This Court has recognized "a trial court would have to go to extraordinary lengths to cure the harm caused by an erroneously admitted confession." *Ince*, 21 F.3d at 583. "Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)); *see also Brevard*, 739 F.2d at 183 (reversing a conviction after reference to a polygraph test, despite the trial court's instruction that the jury should disregard the testimony, because polygraph remarks directly impacted the defendant's credibility when he testified to an alibi defense). The Supreme Court has similarly noted the difficulty for a jury to follow instructions to disregard a co-defendant's confession, recognizing that "[d]espite concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner . . . we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-

---

[3] The Government appears to misstate the holding of *Chong Lam*, asserting that it is never an abuse of discretion for a district court to presume the jury followed a curative instruction. Resp. Br. at 16 (citing *United States v. Chong Lam*, 677 F.3d 190, 204 (4th Cir. 2012). The *Chong Lam* Court, however, engaged in a review of the evidence and the district court's instructions, and found it was not an abuse of discretion to find the jury followed the district court's instruction under those circumstances. Such a case-specific review of the evidence and instructions is necessary in this case as well.

examination." *Bruton v. United States*, 391 U.S. 123, 137 (1968). The Court went on to say, "[t]he effect is the same as if there had been no instruction at all." *Id.*

Finally, this case is closer than the Government asserts, preventing a finding that the hearsay confession was harmless. This Court has recognized the closeness of the case is not a question of sufficiency of the evidence. *Nyman*, 649 F.2d at 212. Said another way, just because there may be sufficient untainted evidence to convict does not mean the erroneous admission of evidence is harmless. In *Ince*, this Court reversed a conviction after finding "the untainted evidence of Ince's guilt fairly strong, but not overwhelming." 21 F.3d at 585; *see also id.* at 581 ("Even if the other evidence which was properly admitted at trial had provided overwhelming proof of Ince's guilt—which it did not . . . Stevens's presentation of additional unsworn hearsay testimony going directly to the issue of Ince's guilt was extremely prejudicial.").

As discussed in detail in Ritter's opening brief, no forensic evidence connected Ritter to the murder; no one saw Ritter and Doe together for nearly three hours before Doe's body was found; and the last person who saw them together "got no indication anything was wrong." Br. at 6–8. To place Ritter with Doe at the time of her death, the Government relied mainly on Xavier Pinckney, Jamie Priester, and Kerria Mallory. Pinckney, who was Ritter's co-defendant and testified pursuant to a plea agreement, said that Ritter answered Doe's phone at 4:41 p.m., about an hour

7

and a half after Ritter and Doe were last seen together. JA329, JA770. Pinckney's testimony, however, had serious credibility issues. First, he repeatedly told the jury he testified against Ritter pursuant to a plea agreement in order to get a reduced sentence.[4] JA787, 793. Pinckney also admitted that he repeatedly lied to the police and only said Ritter answered the 4:41 phone call years after the fact. This discloser came only after multiple meetings over several years and after failing to disclose this information during an initial proffer session with the Government. JA784–786, JA823–824.

Jamie Priester's testimony that she overheard Ritter confess to the murder similarly suffers from serious credibility issues. She was inconsistent on whether she overheard Ritter on the day of or the day after the murder. JA878–879, JA890–892. Priester was also motivated to help the police, admitting she spoke to law enforcement only after her mother had provided some information in hope that it would help her son (Priester's brother) Marcus Witherspoon, the man whose statements from the Richland County Detention Center led the federal government to begin investigating Doe's case in the first place. JA361–364, JA888–889. Priester also gave the police false information, specifically related to the alleged confession. JA366–67. Agent Wiggins testified that Priester told him Doe and Ritter met up on

---

[4] Pinckney pled to Obstruction of Justice in violation of 18 U.S.C. § 1512(b)(3) and faced a maximum term of imprisonment of twenty years. *See* JA25.

8

the day of the murder near where Doe lived, not near The Lane as Wiggins determined through the investigation. JA366. She also told him there was a video on Doe's phone that was the motive for the shooting, but Wiggins and the experts at SLED never recovered any such video. JA367. Priester's testimony was also contradicted by physical evidence from the crime scene. She testified that Ritter fired the first shot from outside the car, Doe "hit the gas," and then Ritter ran up and fired a second shot. JA 881, JA896. This testimony is contrary to undisputed evidence that Doe was shot three times, all three cartridge casings were found inside the car, and that the car was in park when police arrived. JA212, JA234–235, JA985. Priester's "confession" testimony simply could not stand up to any scrutiny by the jurors.

Kerria Mallory's testimony attempted to place Ritter arriving at his uncle's house near the crime scene in the evening, before it got dark outside. JA907. That timing was rendered suspect by Mallory's admission on cross-examination that she had previously told police that Ritter arrived at the house around 2 or 3 p.m., JA919, well before the 4:41 p.m. call to Doe's phone. This earlier timeframe would be consistent with Ritter being dropped off at Peeples's house right after the traffic stop, shortly after 3 p.m., JA243, and Carrie Mae Frazier's testimony that Ritter was at her home in downtown Allendale around 4:15 p.m.[5] JA961–962.

---

[5] The town of Allendale is three and a half to five miles from the crime scene. JA261.

Overall, the evidence placing Ritter with Doe at the time of the murder is based on unreliable witness testimony that was largely incentivized by the witnesses' desires to help themselves (Pinckney hoping to obtain a lesser sentence) or a family member (Priester hoping to help her brother). The hearsay, on the other hand, would have provided the jury with an unchallenged (and unchallengeable) confession of Ritter's commission of the murder from his own uncle. The unreliability of the untainted evidence makes it highly probable that Mallory's hearsay confession testimony would have substantially swayed the jury's decision making and cannot be deemed harmless.

II. **THE DISTRICT COURT MANIFESTLY ABUSED ITS DISCRETION IN DENYING RITTER A NEW TRIAL ON THE BASIS OF JUROR 71'S BIAS.**

The Government incorrectly argues Ritter's juror bias issue cannot be addressed by this Court because it is an "*implied* bias" claim, which "has no role in this postconviction proceeding, where *actual* bias must be proven." Resp. Br. 29 (emphasis original). On the contrary, Ritter raised an actual bias claim based on Juror 71's actions after the trial and answers during the post-trial evidentiary hearing. "Actual bias, or bias in fact, exists when a juror, because of his or her partiality or bias, is not capable and willing to decide the case solely on the evidence before him or her." *Porter v. White*, 23 F.4th 322, 327 (4th Cir. 2022) (cleaned up). "[A] juror is actually biased when he cannot be impartial." *Id*. This Court has recognized "[d]etermining whether a juror is biased or has prejudiced a case is difficult, partially

because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." *Porter v. Zook*, 898 F.3d 408, 425 (4th Cir. 2018) (quoting *Smith v. Phillips*, 455 U.S. 209, 221–22 (1982)). Given a juror's interest in concealing their bias, or unawareness of their bias, multiple courts in this circuit have found that actual bias can be shown by the express admission of the juror or by other relevant evidence, including a juror's inaccurate or incomplete answers on *voir dire*, non-juror evidence of bias, and an examination of the juror's actions. *See, e.g.*, *Porter v. Gilmore*, 479 F. Supp. 3d 252 (E.D. Va. 2020); *United States v. Lawhorne*, 29 F. Supp. 2d 292, 312 (E.D. Va. 1998).

Here, despite Juror 71's protestations that she could render a verdict solely on the evidence at trial, her actions in contacting the press and admission that she exaggerated her own experiences to draw attention to violence against transgender women show otherwise. Of course, most jurors do not run to the press right after a trial is over. Juror 71's decision to do just that indicates several things: (a) at some point before or during the trial, she decided the case had special significance to a cause that means a lot to her; (b) she decided she was the right spokesperson for the cause; (c) she sold herself to the Associated Press as the right spokesperson by exaggerating her own history; and (d) in her haste and enthusiasm to claim that role, she either overlooked or affirmatively disregarded the risks associated with the exaggeration (*e.g.*, being caught lying; destroying her own credibility). Only

11

someone with an uncommonly strong desire to make a point or attract attention would take such actions. That all adds up to something other than the impartiality required of a juror under the Sixth Amendment.

Even if Ritter's claim was one of implied bias, this Court has not foreclosed post-trial claims of implied bias in extreme circumstances. In *Darden v. Barnett*, the Court recognized "[n]either the Supreme Court nor this court has yet squarely addressed whether, under appropriate circumstances, an implication may arise that a juror was biased against the defendant."[6] 74 F.3d 1231, *2 (4th Cir. 1996) (tbl.) (citing *Smith*, 455 U.S. at 221–24 (O'Connor, J. concurring)). This Court has since recognized "the doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances."[7] *Pearson v. Miller*, 854 F.2d 656, 665 (4th Cir. 1988); *see also United States v. Turner*, 389 F.3d 111, 117 (4th

---

[6] In *Smith*, Justice O'Connor identified some situations "that would justify a finding of implied bias," including "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." 455 U.S. at 222 (O'Connor, J. concurring).

[7] The Government's argument that implied bias "has no role in this postconviction proceeding" relies on *United States v. Malloy*, which was decided before the *Pearson* and *Turner* cases that recognized certain extreme circumstances when implied bias does apply. *See* Resp. Br. at 29 (citing *United States v. Malloy*, 758 F.2d 979, 982 n.6 (1985)).

Cir. 2004) (same). Here, the doctrine of implied bias would apply because, as Juror 71 revealed after trial, she has a relationship to the subject of this litigation well beyond what would allow her to remain impartial. Her relationship to the key circumstances of this case—violence against transgender women—is one of advocacy and a personal commitment to redressing. The close and activist relationship makes it highly unlikely she could remain impartial in her deliberations in this case in which Ritter was charged with committing murder on the basis of the victim's transgender identity.

In denying Ritter's juror bias claim, the district court abused its discretion. In a juror bias context, "[a]n abuse of discretion can be found in either of two ways. First, a district court abuses its discretion if it ignores a per se rule of disqualification after counsel moves to exclude a venireman. Second, if the court demonstrates a clear disregard for the 'actual bias' of an individual venireman, reversal is justified." *Turner*, 389 F.3d at 115. The second basis applies here—the district court demonstrated a clear disregard for Juror 71's bias, concluding "Ritter has not offered any evidence to refute Juror 71's repeated, sworn attestations that she could be impartial." JA1474. In reaching this conclusion, the district court failed to address the fact that Juror 71 herself reached out to the Associated Press, a national news organization, to call attention to the trial and her role in convicting Ritter. The district court also failed to address implications of Juror 71's admission to exaggerating her

personal experiences to draw attention to the issue of transgender violence. Despite Juror 71's testimony that she was willing to misrepresent herself in order to "call[] attention" to the issue, JA1295, the district court took the juror at her word that she would be fair and impartial. JA1474. This was a manifest abuse of discretion, warranting reversal.

### III. INSUFFICIENCY OF THE EVIDENCE ON ANY ELEMENT IS SUFFICIENT TO UNDERMINE THE VALIDITY OF A CONVICTION.

Ritter stands on his opening brief with respect to the sufficiency of the evidence claims. In reply, he would just point out that his challenge to the sufficiency of evidence on a single element of an offense—element two of the hate crime charge and element three of the witness tampering charge—in no way concedes his guilt nor undermines the validity of his claims as proof is required on all elements for a conviction to stand. *See Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (recognizing a factfinder must be persuaded beyond a reasonable doubt on each element of an offense). Nor are Ritter's challenges to the sufficiency of the evidence on individual elements a concession that the evidentiary errors in this case were harmless, as the harmless error analysis in not a question of sufficiency of the evidence. *Nyman*, 649 F.2d at 212.

## CONCLUSION

For the reasons stated in Ritter's opening brief and above, Ritter respectfully requests this Court vacate his conviction and remand this case for a new trial.

**LINDSEY S. VANN**  
Justice 360  
900 Elmwood Ave., Suite 200  
Columbia, SC 29201  
(803) 765-1044  
lindsey@justice360sc.org  

BY: s/ Lindsey S. Vann

August 14, 2025.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
**OF THE FEDERAL RULES OF APPELLATE PROCEDURE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3,831 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

s/ Lindsey S. Vann